LOLLEY, J.
1 ¶Bobby Ray Ingram, II, appeals his conviction and sentence by the 26th Judicial District Court, Parish of Webster, State of Louisiana. Previously, we remanded the case to the trial court for the reasons stated in State v. Ingram, 45,546 (La. App.2d Cir.09/22/10), 47 So.3d 1127 (“Ingram I ”). However, our decision was reversed by the Louisiana Supreme Court and remanded for a determination on Ingram’s remaining assignments of error in State v. Ingram, 2010-2274 (La.03/25/11), 57 So.3d 299 (“Ingram II ”). For the following reasons, we affirm Ingram’s conviction and sentence.
Facts
The substantive facts in the case have been reported twice in detail in Ingram I and Ingram II and will not be repeated herein. However, a brief synopsis of the facts follows.
On the afternoon of October 18, 2006, Ingram’s ex-wife, Kimberly “Kim” Ingram, entered Ingram’s home uninvited and was engaged in a brawl on the floor by his front door with his current wife, Nancy. In the scuffle, Ingram shot and killed the *441 unarmed Kim with his hunting rifle. Ingram was charged with second degree murder. Ingram’s first trial ended in a mistrial due to a medical emergency of one of his attorneys. At the conclusion of his second trial, by a vote of 10-2, the jury voted to convict Ingram of manslaughter.
After the trial court denied Ingram’s motion for new trial, a sentencing hearing was held, at which the trial court indicated that it had reviewed the presentence investigation report prepared in this matter along |2with various letters, including a letter from Ingram, and a presentence memo from the defense. The trial court sentenced Ingram to serve 28 years’ imprisonment at hard labor, and Ingram subsequently filed a motion to reconsider sentence. The trial court denied the motion, and Ingram’s appeal ensued.[1]
Discussion

Sufficiency of the Evidence

In his first assignment of error, Ingram submits that the evidence was insufficient to support a verdict of manslaughter because the State failed to prove beyond a reasonable doubt that Kim was not engaged in an unlawful forcible entry of the Ingram residence at the time the homicide occurred. He argues that because Kim had made a forcible entry into his home, his use of lethal force in response was presumed to be reasonable, so the State did not carry its burden of proving his guilt beyond a reasonable doubt. We disagree.
Ingram was convicted of manslaughter, which is defined in La. R.S. 14:31 as:
A. (1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to [¡¡manslaughter if the jury finds that the offender’s blood had actually cooled, or that an average person’s blood would have cooled, at the time the offense was committed....
However, from the outset of these proceedings, Ingram contended that his actions were justified as a lawful reaction to Kim’s conduct immediately prior to the shooting.
The law does not punish the use of force, even deadly force, when the circumstances show that the use of force was justified. Louisiana R.S. 14:18 provides, in part:
The fact that an offender’s conduct is justifiable, although otherwise criminal, shall constitute a defense to prosecution for any crime based on that conduct. This defense of justification can be claimed under the following circumstances:
[[Image here]]
(7) When the offender’s conduct is in defense of persons or of property under any of the circumstances described in Articles 19 through 22.
Louisiana R.S. 14:20 sets out the law in cases where the use of force or violence in defense results in a homicide. That statute, which has recently been supplemented *442 and clarified by the legislature, outlines a number of scenarios where a homicide is justifiable. Ingram argues that his conduct was justified under the provisions of La. R.S. 14:20(A), which provides in pertinent part:
A homicide is justifiable:
⅜ i|: * sj: ⅜ *
(4)(a) When committed by a person lawfully inside a dwelling ... against a person who is attempting to make an unlawful entry into the dwelling ... or who has made an unlawful entry into the dwelling ... and the person committing [4the homicide reasonably believes that the use of deadly force is necessary to prevent the entry or to compel the intruder to leave the premises.... (Emphasis added).
When issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. The reason for reviewing sufficiency first is that the accused may be entitled to an acquittal under Hudson v. Louisiana, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981), if a rational trier of fact, viewing the evidence in accord with Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), in the light most favorable to the prosecution, could not reasonably conclude that all of the elements of the offense have been proved beyond a reasonable doubt. State v. Hearold, 603 So.2d 731 (La.1992); State v. Bosley, 29,253 (La.App. 2d Cir.04/02/97), 691 So.2d 347, writ denied, 1997-1203 (La.10/17/97), 701 So.2d 1333.
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, supra; State v. Tate, 2001-1658 (La.05/23/03), 851 So.2d 921, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004). When the defense of self or others is claimed by a defendant, the State has the burden of proving that the homicide was not perpetrated in self-defense. State v. Reed, 45,237 (La.App.2d Cir.05/26/10), 37 So.3d 1116.
| Jn the instant case, the critical items of proof under La. R.S. 14:20(A)(4)(a) are whether (i) Kim was attempting to or had made an unlawful entry into Ingram’s home, and (ii) Ingram reasonably believed that the use of deadly force was necessary to prevent Kim from entering or to compel her to leave. Both elements need to be present in order to support a finding that Ingram was indeed justified in killing Kim.
Was the entry into the defendant’s home unlawful?
In response to Ingram’s post-verdict motions, the trial court concluded that the jury must have found that Kim’s entry into Ingram’s residence was not unlawful, i.e., the jury believed Kim legally entered Ingram’s home. To reach that conclusion, the trial court relied on Nancy’s admission that she told Kim to “come on down the driveway” before Kim entered the house. Because in this criminal case the jury made no specific findings of fact, the record does not reflect the jury’s determination on this particular question of fact. However, even viewing the evidence in the light most favorable to the State (as we are compelled to do) and completely discounting the testimony of Nancy and Ingram, the evidence tends to show that Kim was not making a lawful entry into the Ingrams’ residence. Kim drove her car through the defendant’s front yard, skidded her car to a stop only feet from his *443 front door, and left her belongings in her car with the door open as she came to the front door. Even if Nancy had agreed to engage in fisticuffs with Kim by telling her to “come on down the driveway,” her agreement would not render Kim’s entry into the home lawful under these circumstances where the purported invitation did not | (¡extend to permission for Kim to enter into the house. More importantly, there was no evidence that Ingram knew or had reason to believe that Nancy had invited Kim into the home for any purpose. Even in the light most favorable to the State, it did not prove beyond a reasonable doubt that Kim’s entry into the home was lawful.

Was the use of deadly force necessary?

Although Kim’s entry into the home may have been unlawful, in order to show justifiable homicide under La. R.S. 14:20(A)(4)(a), the State must show that Ingram was unreasonable to believe that the use of deadly force was necessary either to prevent Kim from entering or to compel her to leave. This is where Ingram’s defense falls short. Ingram argues that he was entitled to rely on the presumption of reasonableness he states is provided in La. R.S. 14:20(B), because the evidence showed that Kim had unlawfully and forcibly entered his home and that he knew or had reason to believe that an unlawful and forcible entry was occurring or had occurred. He further argues that the jury was required to conclude that his use of deadly force was reasonable because of the operation of the presumption. We disagree.
The justifiable homicide statute allows a presumption of reasonableness in certain circumstances. Louisiana R.S. 14:20(B) provides:
For the purposes of this Section, there shall be a presumption that a person lawfully inside a dwelling ... held a reasonable belief that the use of deadly force was necessary to prevent unlawful entry thereto, or to compel an unlawful intruder to leave the premises ..., if both of the following occur:
|,(1) The person against whom deadly force was used was in the process of unlawfully and forcibly entering or had unlawfully and forcibly entered the dwelling....
(2) The person who used deadly force knew or had reason to believe that an unlawful and forcible entry was occurring or had occurred.
The term “presumption” is undefined in La. R.S. 14:20 and appears sparingly in Title 14 of the Revised Statutes. Louisiana R.S. 14:19 and 14:20 both use the term in conjunction with justification for the use of force to prevent or repel an unlawful entry. These statutes do not include the adjective “rebuttable” before the word “presumption,” and both statutes say that, under the listed circumstances, there “shall” be a presumption that the defendant had a reasonable belief that the use of deadly force was necessary.
Black’s Law Dictionary (9th ed.2009) defines presumption as:
A legal inference or assumption that a fact exists, based on the known or proven existence of some other fact or group of facts. Most presumptions are rules of evidence calling for a certain result in a given case unless the adversely affected party overcomes it with other evidence. A presumption shifts the burden of production or persuasion to the opposing party, who can then attempt to overcome the presumption.
There is definitely a distinction between the presumption in the justifiable homicide statute and the presumptions in the remainder of the criminal code. With the exceptions of the presumptions in La. R.S. 14:19 and 14:20, the presumptions in the *444 criminal code are those that operate against an accused. In other words, except for La. R.S. 14:19 and 14:20, the presumptions in the code aid the State in establishing an element of a crime upon proof of certain predicate facts. Such presumptions have raised due process concerns in the past, but at least some of these presumptions in | ¿favor of the State are considered to be permissive and not mandatory in nature. State v. Caruso, 1998-1415 (La.03/02/99), 733 So.2d 1169.
By contrast, the presumptions in La. R.S. 14:19 and 14:20 are in favor of the accused rather than the State. This distinction is significant, because the Due Process Clause of the United States Constitution does not restrict the legislature from creating presumptions in favor of the accused. “Crimes” are that conduct which is defined as criminal in the Criminal Code, other acts of the legislature, or in the Constitution. La. R.S. 14:7. The legislature is constrained by the Federal and State Constitutions in expanding the definitions of crimes, but the legislature is free to shrink the scope of the definition of a crime, should it desire to do so, by withdrawing an act from the definition of criminal conduct. Thus, it is possible for the legislature to create a mandatory presumption in favor of a defendant in a criminal statute, and, in the case sub judi-ce, the defendant essentially argues that the presumption in La. R.S. 14:20 is such a mandatory presumption.
Generally, any doubt or ambiguity within a criminal statute should be resolved in favor of lenity. State v. Fussed, 2006-2595 (La.01/16/08), 974 So.2d 1223. However, the legislature’s use of the term “presumption” in the justifiable homicide statute does not carry that degree of ambiguity which requires the application of the principle of lenity. Louisiana R.S. 14:3 provides:
The articles of this Code cannot be extended by analogy so as to create crimes not provided for herein; however, in order to promote justice and to effect the objects of the law, all of its provisions shall be given a genuine construction, according to the fair import of their words, taken in their usual |nsense, in connection with the context, and with reference to the purpose of the provision.
When interpreting statutes, the court should, if possible, give meaning to every word and every section. See, e.g., State v. Cazes, 262 La. 202, 263 So.2d 8, 12 (1972), citing Fruge v. Muffoletto, 242 La. 569, 137 So.2d 336 (1962):"
Meaning should be given, if possible, to each and every section, and the construction placed on one portion should not be such as to obliterate another; so, in determining the meaning of a word, phrase or clause, the entire statute is to be considered.
Although the legislature has the power to expand the justifiable homicide defense to conclusively declare the use of deadly force reasonable in every case of unauthorized entry, it has not done so. Instead, the legislature clarified and expanded the “reasonable and necessary” requirement in La. R.S. 14:20(A) with the use of the “presumption” language in La. R.S. 14:20(B). The statute says that there “shall” be a presumption of reasonableness but not that the presumption is irrebutta-ble.
With the presumption, the law recognizes that forcible entry situations often develop quickly and may present a threat of harm that allows little time for a homeowner to carefully weigh his options in defending himself. As Justice Holmes famously stated in a related context, “Detached reflection cannot be demanded in *445 the presence of an uplifted knife.” Brown v. United States, 256 U.S. 335, 343, 41 S.Ct. 501, 502, 65 L.Ed. 961 (1921). However, the presumption of reasonableness in La. R.S. 14:20(B) is not a license to kill, The legislature’s decision to use the term “presumption” rather than a mandatory inference of reasonableness means that the State is entitled to offer proof that a person’s use of deadly force |1flwas unreasonable even in cases where the victim has made unlawful entry into the defendant’s home. If the State can prove beyond a reasonable doubt that the use of force was unreasonable, the defendant may still be guilty of homicide.
Louisiana R.S. 14:20 contains two other sections worthy of consideration before concluding whether the State met its burden of proof in this case. They provide:
C. A person who is not engaged in unlawful activity and who is in a place where he or she has a right to be shall have no duty to retreat before using deadly force as provided for in this Section, and may stand his or her ground and meet force with force.
D. No finder of fact shall be permitted to consider the possibility of retreat as a factor in determining whether or not the person who used deadly force had a reasonable belief that deadly force was reasonable and apparently necessary to prevent a violent or forcible felony involving life or great bodily harm or to prevent the unlawful entry.
With these provisions, the legislature has curtailed the evidence that may be offered by the State in proving the use of force unreasonable, and specifically has forbidden the consideration of the possibility of retreat vis-a-vis the use of force. This represents a change in the law, which formerly allowed the consideration of the possibility of escape; see, e.g., State v. Brown, 414 So.2d 726 (La.1982).
The unavailability of the retreat defense does not end the inquiry into the reasonableness of the use of force even when the accused is in his own home. Apart from the “unlawful activity” and “has a right to be” qualifiers, Section C recognizes that a person may “meet force with force.” That is the crux of this case — whether Ingram’s use of deadly force was a proportional h ¶response to the force used or threatened by Kim. After considering the entire record, we conclude that a rational trier of fact could have found beyond a reasonable doubt that Ingram acted unreasonably in using deadly force against Kim.
The jury concluded that Ingram’s choice — to shoot Kim — was unjustified. Initially and significantly, we note that as a reviewing court we have no choice but to review a cold record. An appeal court cannot observe the demeanor of the witnesses testifying at trial as the jury did at trial. Importantly, we observe that three people have (or had, in the case of the victim) knowledge of the incidents on October 18, 2006. Both Bobby Ray and Nancy Ingram testified at the trial, giving their version of the events that transpired that day. Notably, the third witness was not alive to rebut the self-serving testimony of the Ingrams. Obviously, these are considerations a jury is free to make and will make in its deliberations.
In determining whether Ingram was justified in shooting Kim, the jury heard the testimony of the two living witnesses to the event and saw the photos of the crime scene and the victim, so they were aware of the relative physical sizes of Ingram and Kim. The jury heard testimony that Ingram was angry with Kim as the result of a letter he received that day from her attorney related to the couple’s community property settlement. Likewise, the jury heard the recordings of the 911 calls from Ingram that included his statement that *446 Kim had no weapons that he knew of, but that he was going to have to “do something” if she came into the house. Further, the jury heard the testimony of the experts retained by both sides who gave their 112opinions about the victim’s position at the time of the fatal shot, with the State’s expert opining that Kim was in a “defensive” position when she was shot. As the State points out, there are many levels of force less than deadly force that Ingram could have used once he saw Kim and had the opportunity to discover that she was unarmed. Instead, Ingram responded to Kim’s unarmed assault on Nancy with grossly disproportionate force that ended Kim’s life. The evidence was sufficient to prove beyond a reasonable doubt that the use of deadly force under the circumstances was unreasonable and that the defendant is guilty of manslaughter.
As an alternative to a verdict of acquittal, the defense urges that a verdict of guilty of negligent homicide is appropriate. However, Ingram admitted that he deliberately fired the gun in response to what he claimed was a lunge toward him from Kim. The act of firing the gun under these circumstances was intentional, not criminal negligence, so negligent homicide is not an appropriate verdict. So considering, this assignment of error is without merit.

Drug Test Results

In his second assignment of error, Ingram argues that the trial court committed reversible error by allowing into evidence the results of a purported drug test even though the State did not call the analyst who performed the test. At the trial of the matter, the trial court allowed Dr. Frank Peretti, the State’s forensic pathologist, to testify that a laboratory test, performed by an out-of-state lab and not the pathologist, showed that Kim did not have drugs in her system when she was shot. The report was | ^admitted into evidence, but the defendant objected to the pathologist’s testimony and the report on the grounds that he had no opportunity to confront and cross-examine the person performing the test. The trial court overruled the objection, essentially allowing the evidence under La. C.E. art. 703.
Melendez-Diaz v. Massachusetts, — U.S. -, 129 S.Ct. 2527, 174 L.Ed.2d 814 (2009), involved a defendant who had been convicted of distributing and trafficking cocaine. In support of its case, the prosecution introduced certificates of analysis as a substitute for in-court testimony to show that the substance recovered from that defendant was cocaine. The certificates were sworn to before a notary public by analysts at the State Laboratory Institute of the Massachusetts Department of Public Health. Id. at 2581. The Supreme Court held that the certificates were testimonial statements and the prosecution could not prove its case without first showing that a witness was unavailable and that the defendant had had an opportunity to cross-examine him. Specifically, the Supreme Court explained that the Confrontation Clause of the Sixth Amendment requires that a defendant have the opportunity to confront the witnesses against him, and that these witnesses include persons who conduct laboratory testing when the tests are to be admitted into evidence. Id.
Violations of the confrontation clause are subject to a harmless error analysis. Delaware v. Van Arsdall, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986); State v. Broadway, 1996-2659 (La.10/19/99), 753 So.2d 801, cert. denied, Broadway v. Louisiana, 529 U.S. 1056, 120 S.Ct. 1562, 146 L.Ed.2d 466 (2000); State v. Davidson, 44,916 (La.App.2d Cir.02/10/10), 32 So.3d 290, writ denied, *447 2010-0579 (La.10/01/10), 45 So.3d 1096. The verdict may stand if the reviewing court determines that the guilty verdict rendered in the particular trial is surely unattributable to the error. State v. Davidson, supra; Sullivan v. Louisiana, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993). The harmless error doctrine preserves the “principle that the central purpose of a criminal trial is to decide the factual question of the defendant’s guilt or innocence, and promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error.” Arizona v. Fulminante, 499 U.S. 279, 308, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991).
In determining whether the error was important in the prosecution’s case, one must focus on the elements of the charged crime. See Delaware v. Van Arsdall, 475 U.S. at 684, 106 S.Ct. 1431. Notably, the lab report in Melendez-Diaz was directly connected to the charges against that defendant and a crucial piece of evidence against him. Here, the State’s burden of proving its case against Ingram did not include proof that the victim was drug or alcohol free, so the lab report did not prove an essential element of the case as it did in Melendez-Diaz. Because the presence or absence of drugs in the victim’s body was not an element of the offense, the harm to the defendant from this error is none.
Moreover, we note that although Ingram argues that the State emphasized the “no drugs” fact to the jury in proving that the shooting was 1 lfinot justified, it hardly appears that the State’s “no drugs” argument was emphasized. In fact, the evidence on this point is minuscule compared to the body of evidence against Ingram. Additionally, we fail to see how proof that Kim was drug or alcohol free even goes to the reasonableness of Ingram’s action when considering all of the other evidence against him. Regardless of whether Kim was on drugs or not, she was still a woman, smaller than Ingram, and he knew she was unarmed. Considering the actual facts of this case, it is apparent that the jury had enough evidence to reach its conclusion that Ingram’s actions were not reasonable regardless of this drug report, making its admission into evidence harmless. Even if the trial court erred in admitting the evidence here because it violated Ingram’s right to confront the analyst who prepared the report, such error was harmless also because there is no reasonable probability that it contributed to the verdict. This assignment of error is without merit.

Alteration of 911 Transcript

Ingram also argues that the trial court erred by denying his motion for a new trial based on the State’s deliberate use of an altered transcript of the 911 call. During Ingram’s first trial, when the State introduced the 911 recordings into evidence, it also supplied the jury with a transcript of those recordings. The transcript was prepared by a secretary, Angela Hall, in the District Attorney’s office. The last page of this transcript bears the typewritten notation “Transcribed by Angela Hall 11/16/06.” At Ingram’s second trial, upon the playing of the 911 recording, the State again offered a transcript of the call. The last page of this second transcript also bears the | ^typewritten notation “Transcribed by Angela Hall 11/16/06.” However, the transcripts are different.
The following is a merger of the two transcripts; language in the transcript from the first trial that is not in the revised transcript is indicated with a strikeout font; language that is in the second transcript that does not appear in the first transcript is indicated in a bold font:
*448 (Raised voices can be heard in background)
911: Webster 911
Bobby Ingram: Yeah I have uh my ex wife here threatening to whoop my wife’s behind at my house
Webster 911: at 391 Angie Road?
Bobby Ingram: yes will you please hurry?
Webster 911: What’s her name?
Bobby Ingram: Kim Ingram 911: Kim?
Bobby Ingram: yeah
911: Ok, Does she have any weapons sir?
Bobby Ingram: Uh not that I know of but they’re screaming out up front and if she comes in this house I am going to have to do something oh she
(Disconnects)
911: but she’s outside?
(inaudible)
(Disconnects)
In the second trial, the revised transcript was admitted into evidence and published to the jury contemporaneously with the playing of the 911 117recording. At Ingram’s request, the trial court gave the jury a cautionary instruction that the recording, not the transcript, was the best evidence of what was said.
During the questioning of the 911 operator at trial, Ingram’s attorney discovered the discrepancy between “up” and “out” in the two transcripts because the 911 operator’s copy of the transcript was the second version, but the defense attorney’s version was the original version from the first trial. Once the discrepancy was discovered, Ingram moved to introduce the original transcript into evidence.
During argument, the State maintained that during the first trial, the 911 operator testified that she heard Ingram say “out” rather than “up,” so the prosecutor instructed his secretary to change the transcript to reflect that information. Ingram’s attorney noted that the prosecutor had not provided Ingram with any notice of the change in the transcript, and he then asked the trial court to allow the jury to see both versions of the transcript.
Pursuant to the request of Ingram’s attorney, the trial court allowed the transcript from the first trial to be introduced into evidence along with the later transcript and stated its intent to give another cautionary instruction regarding reliance on the transcript. Ingram’s attorney explicitly stated that he had no objection. Ultimately, the jury was made well aware of the discrepancies in the transcripts and heard the recording of the 911 calls several times, including during deliberations.
Subsequently, in his motion for new trial, Ingram argued that the ends of justice would be served by granting his motion, partly because of the 1 ^alteration in the transcript. The trial court rejected that contention when it denied the motion. Now, on appeal, Ingram argues that he was prejudiced by the introduction into evidence of the altered transcript because the alteration — of which he was not informed — was an effort by the State to bolster its case that Kim was invited into Ingram’s home. He asserts that ordering a new trial would send a message that the State’s use of evidence that was altered unbeknownst to the defense will not be tolerated.
Generally, transcripts of recorded material are admissible along with the material itself because the transcript aids the jury in considering the recorded material. State v. Snedecor, 294 So.2d 207 (La.1974). Of course, it is axiomatic that the transcript must be as accurate as pos *449 sible given any technical limitations of the source material; a transcript that is inaccurate in a significant way yet admitted into evidence potentially raises a number of issues, some of constitutional significance.
Notably, the State’s use of the altered transcript without notice to the defense was, at least, unprofessional, and, at most, unethical. Nevertheless, a reading of the entire argument at trial about this issue suggests that the defense did not object to the trial court’s handling of the issue of the revised transcript. Typically, a defendant may not avail himself of any trial error to which he did not specifically object. La. C.Cr.P. art. 841. In the instant case, Ingram’s attorney did argue the change issue to the trial court, but stated, “All we’re asking is for the jury to see both versions.” He explicitly stated that he had no objection to the trial court’s handling of the transcript issue.
 |inNotably, trial courts are given wide latitude in ruling on motions for new trial, where appellate review is limited to errors of law. La.C.Cr.P. art. 858. The trial court was present during the trial and heard, along with the jury, what could be heard on the recording. At trial, the defense only asked the trial court to allow the jury to see both transcripts, so one could argue that the defense acquiesced in the trial court’s handling of the situation. Further, because the jury heard the 911 recording itself a number of times, both transcripts were shown to the jury, the jury was instructed that the recording was the best evidence of what was said and the evidence against the defendant included much more than that recording, any error with the altered transcript is harmless beyond a reasonable doubt.
In brief, the State relies heavily on the failure of the defendant to object to the admission of the transcript into evidence, but in this case, applying the usual “failure to object” rule to these facts is problematic. The prosecutor, an officer of the court, changed the transcript and offered it into evidence without notifying the defendant’s attorney, who had little or no opportunity to object because he was unaware of the change before the transcript was admitted into evidence. Although the actions of the State did not warrant a new trial considering the totality of the circumstances, we strongly advise the State that the alteration or amendment of evidence is wholly unacceptable in any case, no matter what its intent may have been. We consider the State’s action in this regard to be a serious breach of the prosecutor’s duty as an officer of the court, but even so, we conclude that |j>nthe action did not .affect the outcome of the trial. Accordingly, the prosecutor is admonished not to take such action in the future.

Lack of Unanimity of Verdict

In another assignment of error, Ingram argues that the lack of a requirement of an unanimous verdict denied him of his fundamental rights to trial by jury, and due process of law, as guaranteed by the U.S. and Louisiana Constitutions. We disagree.
Before trial, via a motion to quash, Ingram challenged the constitutionality of Louisiana’s scheme allowing a defendant to be convicted of murder by a non-unanimous jury. He alleged that La.C.Cr.P. art. 782, which allows a jury to return a 10-2 verdict to convict in non-capital felony cases, violated his rights under various provisions of the Federal and State Constitutions. The trial court denied the motion on June 30, 2008.
This article is taken from the requirements of La. Const. Art. 1, § 17. The Louisiana Supreme Court has recently decided that La. C.Cr.P. art. 782 is constitu *450 tional. State v. Bertrand, 2008-2215 (La.03/17/09), 6 So.3d 738. On this precise issue, BeHrand is the controlling jurisprudence on the issue in the state of Louisiana, and the decision fully answers Ingram’s arguments on appeal, which are now preserved for subsequent state and/or federal review. Accordingly, we conclude that this assignment of error is without merit.
| ^Sentencing
In his final assignment of error, Ingram argues that the imposition of a 28-year hard labor sentence is excessive and constitutes prejudicial error. Specifically, he claims the trial court did not take into account that: he acted under strong provocation; there were substantial grounds tending to excuse or justify his conduct; and, his conduct was the result of circumstances that were unlikely to recur. Further, he argues that the trial court failed to appropriately consider that the sentence would result in excessive hardship for the defendant and his children. We disagree.
The test imposed by the reviewing court in determining the exces-siveness of a sentence is two-pronged. First, the record must show that the trial court took cognizance of the criteria set forth in La.C.Cr.P. art. 894.1. The trial judge is not required to list every aggravating or mitigating circumstance so long as the record reflects that he adequately considered the guidelines of the article. State v. Smith, 433 So.2d 688 (La.1983); State v. Lathan, 41,855 (La.App.2d Cir.02/28/07), 953 So.2d 890, writ denied, 2007-0805 (La.03/28/08), 978 So.2d 297. The articulation of the factual basis for a sentence is the goal of La.C.Cr.P. art. 894.1, not rigid or mechanical compliance with its provisions. Where the record clearly shows an adequate factual basis for the sentence imposed, remand is unnecessary even where there has not been full compliance with La.C.Cr.P. art. 894.1. State v. Lanclos, 419 So.2d 475 (La.1982); State v. Swayzer, 43,350 (La.App.2d Cir.08/13/08), 989 So.2d 267, writ denied, 2008-2697 (La.09/18/09), 17 So.3d 388. The important elements which should be ^considered are the defendant’s personal history (age, family ties, marital status, health, employment record), prior criminal record, seriousness of offense and the likelihood of rehabilitation. State v. Jones, 398 So.2d 1049 (La.1981); State v. Ates, 43,327 (La.App.2d Cir.08/13/08), 989 So.2d 259, unit denied, 2008-2341 (La.05/15/09), 8 So.3d 581. There is no requirement that specific matters be given any particular weight at sentencing. State v. Shumaker, 41,547 (La.App.2d Cir.12/13/06), 945 So.2d 277, writ denied, 2007-0144 (La.09/28/07), 964 So.2d 351.
Second, a sentence violates La. Const. Art. 1, § 20, if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. State v. Smith, 2001-2574 (La.01/14/03), 839 So.2d 1; State v. Dorthey, 623 So.2d 1276 (La.1993). A sentence is considered grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice. State v. Weaver, 2001-0467 (La.01/15/02), 805 So.2d 166; State v. Robinson, 40,983 (La.App.2d Cir.01/24/07), 948 So.2d 379.
The penalty for manslaughter is provided in La. R.S. 14:31(B), which states, “Whoever commits manslaughter shall be imprisoned at hard labor for not more than forty years.” There is no minimum sentence for manslaughter. The prosecutor did not seek enhancement of the sentence under La.C.Cr.P. art. 893.3(E); see La. C.Cr.P. art. 893.1. Since the maximum sentence for manslaughter is 40 years, the *451 defendant’s 28-year sentence is 70% of the maximum.
123At the time of the offense, Ingram was 40 years old, had four minor children, and was employed as a supervisor at a Shreveport factory. He has a lifelong employment history and served in the Army National Guard. The defendant has essentially no criminal history; his only prior offense was a single traffic ticket. The record reflects that the trial court gave consideration to the factors in La. C.Cr.P. art. 894.1, finding principally that a lesser sentence would deprecate the seriousness of the defendant’s crime, that the defendant needed to be committed to an institution, that he used actual violence and a firearm in the commission of the offense and that he should have contemplated that his conduct would cause serious harm. The trial court also stated that “the one fact that is undisputed and that is uncontradicted ... in both versions of what happened ... was that on October the 18th, 2006, Mr. Ingram shot an unarmed woman at close range with a high powered rifle.”
In considering the nature of the crime, Ingram would have us consider Kim’s conduct, arguing that the trial court erred in focusing on Ingram’s actions. We note that the jury did not accept Ingram’s defense that he was justified in shooting Kim because of her conduct; therefore, in considering the nature of the crime for purposes of sentencing, it seems illogical to give Ingram leniency in sentencing based on Kim’s conduct. As observed herein, the jury and the trial judge were present at Ingram’s trial and had the opportunity to hear and see the witnesses regarding the incident. The jury rejected the defense, and the trial judge likewise apparently weighed Kim’s conduct against Ingram’s response to it (i.e., shooting her at close range [24with a high powered rifle) and made a determination that Ingram’s actions were excessive. Finally, this is not a case of Ingram meeting force with like force. When considering the choice that Ingram made to stop Kim and the crime that resulted, we cannot say that the trial court’s sentence was excessive.
Regarding Ingram’s nature and background, much is made of the fact that he was a law-abiding, employed citizen, the standard to which all citizens should live even if we consider them mitigating factors in fashioning a sentence. It cannot be ignored, nonetheless, that this law-abiding citizen with a job committed a terrible crime — he killed his former wife and the mother of three of his children. Despite the fact that it was his first crime, it was a particularly bad crime to start off with, considering that the woman he shot and killed was unarmed. He had a personal relationship with Kim and at one time thought enough of her to marry and have three children with her. The trial court’s sentence sends a message that domestic crime is no less serious than any other crime.
A manslaughter conviction exposes a defendant to a potential 40-year prison term at hard labor. Here, the trial court gave adequate consideration to the nature of the crime and any mitigating factors weighing in Ingram’s favor. So considering, Ingram’s sentence is neither grossly out of proportion to the seriousness of the offense, nor a needless infliction of pain. It is not shocking to the conscience for this shocking crime. The imposition of the 28-year sentence was within the trial court’s discretion, and we see no error.
| ^Conclusion
Therefore, the conviction and sentence of Bobby Ray Ingram are affirmed.
*452 CONVICTION AND SENTENCE AFFIRMED.

. Initially in Ingram I, we considered the defendant's appeal and remanded the matter to the trial court as to an issue raised by Ingram regarding a juror. After granting the State's writ application, the Louisiana Supreme Court, in Ingram II, reversed our holding, concluding that the trial court’s treatment of the juror issue was not in error. The matter has been remanded to this court for consideration of Ingram's remaining assignments of error not addressed by our opinion in Ingram I.