MARC E. JOHNSON, Judge.
12Defendant, Jeffery Davis, appeals his conviction for second degree murder on the basis he was denied his constitutional right to confront a witness and the erroneous admission of other crimes evidence. For the reasons that follow, we affirm Defendant’s conviction and sentence.
Defendant was indicted by a grand jury on May 5, 2011 and charged with the second degree murder of Rodney Ross in violation of La. R.S. 14:30.1,[1] He proceeded to trial on October 2, 2012. After a four-day trial, a 12-person jury found Defendant guilty as charged. The trial court subsequently sentenced Defendant to life imprisonment without the benefit of parole, probation or suspension of sentence.

FACTS

Shortly after midnight on April 11, 2010, the Jefferson Parish Sheriffs Office (JPSO) received two 911 calls regarding multiple shots being fired in the |31000 block of Dimarco Street in Marrero. Sergeant Eddie Klein with the JPSO responded to the calls. When he arrived, he observed the murder victim, Rodney Ross (also known as “Mob”), lying on the ground along with ten .45 caliber casings and two 9 mm casings. An autopsy revealed the victim sustained two gunshot wounds to the head and eleven gunshot wounds to the rest of his body. The autopsy also showed that two separate guns were used to shoot the victim.
During the investigation, Sgt. Klein learned that a maroon GMC or Chevy pickup truck was seen leaving the scene. Surveillance cameras from nearby businesses captured the pickup truck but not the license plate or any occupants. Sgt. Klein also discovered that a similar maroon pickup truck was involved in a nonfatal shooting with .45 caliber casings that occurred six days earlier on April 5, 2010. He viewed still photographs from surveillance video of that incident, which he subsequently showed to co-defendant Rob-breion Green’s mother, who thought the person in the photograph was “Telly.” After a computer search, an arrest warrant was issued for Telly Westerman on April 12, 2010 for attempted murder in connection with the April 5th shooting. Wester-man came into the Detective Bureau later that night, waived his rights and gave five statements, three of which related to the April 10th homicide.
*1164 In his first statement dated April 13, 2010 at 2:28 a.m., Westerman stated that on the day of the murder, he, Maurice Williams, Green, Defendant, and Ross gathered around 5:00-6:00 p.m. at Williams’ mother’s apartment at 1000 Dimarco. Westerman explained that he left the apartment around 10:00-11:00 p.m. and went to his girlfriend’s house. He later received a phone call from Ross, who angrily accused him of taking his gun. Wester-man told Ross that he did not have his gun. Ross called five to seven more times and, although no one said anything on the phone each of those times, Westerman could hear the group talking about a gun. _JjWesterman then decided to go back to the apartment to see what was going on. When he arrived, Williams, Green, Defendant and Ross were there, and the victim was upset that someone had taken his gun.
Westerman reminded Ross that when he left, Ross was playing with his small black and gray gun and Green’s gray and black 9 mm gun on the floor. At that point, Wes-terman and Williams decided to go to Tim’s Billiards to play pool, which was located around the corner from the apartment. Green and Davis jumped into the truck with them, but Ross stayed behind. Before arriving at Tim’s Billiards, Green asked Westerman to bring him back to the apartment so he could get “something.”
Westerman complied and went back to the apartment. When they arrived, everyone got out of the truck except Wester-man. While Westerman was waiting, he saw Williams in his rearview mirror coming down the alley. Williams opened the door of the truck and was about to enter it when Westerman heard two shots. Wes-terman turned around and saw Defendant shooting Ross and Ross falling to the side. Green subsequently returned to the truck and said he had shot Ross in the head with the last two shots.
According to his statement, Westerman and Williams left the scene in Westerman’s truck, but later encountered Defendant and Green walking down the street and let them get into the truck. They then went to Tim’s Billiards. After learning there were no pool tables available, the group walked back to the truck so Westerman could get his pool stick. Westerman told Defendant and Green to get their guns out of his truck and hide them, which they did.[2] Afterward, they went back inside Tim’s Billiards and then left.
| ¡Westerman stated he dropped everyone off on Carmadelle in front of Defendant’s house, after which Westerman called his girlfriend and went to her house. Westerman told his girlfriend what had happened.[3] Approximately one hour later, Williams called Westerman and told him “they” were looking for a maroon truck. Westerman later spoke to Defendant, who told him that he had talked to the police and that the police wanted to question him as well.
In his statement, Westerman confirmed he had positively identified Green in a photographic lineup. He further stated that he knew Defendant had gone back and retrieved his gun, but was unsure whether Green had done so because he had not talked to Green since the shooting. *1165 Westerman gave a second statement at 3:17 a.m., in which he confirmed that he had viewed photographic lineups and had positively identified Williams. He gave a third statement at 4:56 a.m., in which he stated that Defendant and Green did not walk away from the scene after they shot Ross like he claimed in his first statement, but that they got into his truck immediately after the incident.[4]
After Westerman gave his statements, Sgt. Klein obtained video surveillance from Tim’s Billiards, which he said confirmed Westerman’s account of what happened. Sgt. Klein further testified that Wester-man’s statements were consistent with the physical evidence. He stated ballistics tests showed that a .45 caliber gun and a 9 mm gun were used to kill Ross. The .45 caliber gun used in the murder was recovered and was determined to be the same gun Defendant used in the April 5, 2010 non-fatal shooting.
| fiAt trial, Westerman was the State’s primary witness. Westerman’s trial testimony was similar to the statements he made to the police; however, he additionally testified at trial that the day after Ross’ murder, Williams showed him Ross’ 9 mm gun and said, “I told that b*tch I got him.” Westerman also testified that a month prior to Ross’ murder, he and Williams were riding up the street when they saw Ross. Williams told Westerman to stop and he did. Williams and Ross pushed each other, and Williams yelled to Ross, “I’m going to kill you b*tch.” Wes-terman explained that Williams was upset because Ross had “hollered” at the mother of his child; however, Ross said it was Green who had done so.
Westerman explained that he omitted this information when giving his statements to the police because he wanted to protect Williams, who was his close friend. He stated he disclosed the additional information approximately one year after Ross’ murder. Westerman testified that he was initially charged with second degree murder in the instant case and aggravated second degree battery in the April 5, 2010 non-fatal shooting. The aggravated second degree battery charge was later changed to three counts of attempted murder. In exchange for his trial testimony in the present case, Westerman pled guilty to reduced charges of accessory after the fact. Westerman explained that he faced zero to five years for each charge or possibly probation.

DISCUSSION

Defendant raises two assignments of error on appeal. First, he claims his Sixth Amendment right to confront his accusers was violated when the trial court admitted the unsworn, out-of-court statement of Williams’ mother, Eunice Williams, who refused to testify at trial. Defendant specifically asserts he did not have the opportunity to cross-examine Ms. Williams and, thus, her statement was inadmissible under Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158_|¿L.Ed.2d 177 (2004). Second, Defendant argues the trial court erred in admitting evidence of the April 5, 2010 non-fatal shooting as other crimes *1166 evidence when he offered to stipulate that he possessed the murder weapon six days before the murder.

Right to Confrontation

Defendant maintains that he was not afforded an opportunity to cross-examine Ms. Williams because she refused to testify at trial by repeatedly stating she did not remember anything and by invoking her Fifth Amendment privilege against self-incrimination. He contends that Ms. Williams’ out-of-court statement was intended to bolster the damaged credibility of the State’s key witness, Westerman.
The State maintains that Defendant had the opportunity to cross-examine Ms. Williams at trial but chose not to do so. It further argues that under United States v. Owens, 484 U.S. 554, 108 S.Ct. 838, 98 L.Ed.2d 951 (1988), Ms. Williams’ memory loss does not constitute a Confrontation Clause violation.
Approximately three months after the murder, Ms. Williams gave a recorded statement to the police. In her statement, Ms. Williams stated she arrived home around 10:00 p.m. on the night of the murder to find Ross, who she identified as her cousin, inside, alone playing video games. She asked where her son, Wester-man, Green and Defendant were and Ross told her they were at the pool hall. Ms. Williams could tell something was wrong, but Ross did not talk to her about it.
Ross asked Ms. Williams for Wester-man’s phone number and then called him. Ms. Williams overheard Ross telling Wes-terman, “man stop playing.” Shortly thereafter, her son, Westerman, Green and Defendant came to the apartment. Green came inside while everyone else stayed outside in front of the 1 sdoor. Then, Green and Ross went out the door, and Ms. Williams closed it. About a minute after she closed the door, she heard approximately nine gunshots. She waited awhile and opened the door to find police on the scene and Ross lying on the ground. She stated she had positively identified her son, Westerman, Green, Defendant and Ross from photographic lineups.
Ms. Williams testified at the suppression hearing and at trial; however, both times she claimed that she did not remember a murder occurred outside her door or that she had talked to the police about what she saw. She explained that her memory was faulty because she was under the influence of drugs at that time.
In response to specific questions at trial, Ms. Williams repeatedly asserted that she did not remember anything. When the State played an innocuous portion of her recorded statement, Ms. Williams admitted it sounded like her. The State then asked Ms. Williams to review her transcribed statement in an attempt to refresh her memory; however, Ms. Williams continued to claim that she did not remember it. Ms. Williams explained that she had been threatened and was afraid for her life, and she briefly pled “the Fifth.”[5] The trial *1167 court reminded her that an attorney had previously advised her regarding this matter.
Thereafter, co-defendant Green’s counsel cross-examined Ms. Williams by asking if she was aware her son filed paperwork in his perjury case alleging she was a drug addict and did not know what she saying, and Ms. Williams replied that[3it was true. She again stated she did not recall making a statement to the police. Defendant’s counsel declined to cross-examine Ms. Williams.
Ms. Williams’ statement was subsequently introduced during Sgt. Klein’s testimony. Sgt. Klein testified that Ms. Williams did not appear to be intoxicated or under the influence of drugs when she gave her statement to him. Defense counsel objected to the admission of Ms. Williams’ statement on the basis it was testimonial hearsay that violated the Confrontation Clause. The trial court allowed the statement into evidence, and it was played for the jury.
The Sixth Amendment to the United States Constitution guarantees an accused in a criminal prosecution the right to be confronted with the witnesses against him. The confrontation clause of the Louisiana Constitution specifically and expressly guarantees the accused the right “to confront and cross-examine the witnesses against him.” La. Const. Art. I, § 16. See also State v. Robinson, 01-273 (La.5/17/02); 817 So.2d 1131, 1135. Confrontation not only means the ability to confront the witnesses physically but also to secure for the opponent the opportunity of cross-examination, which is its main and essential purpose. Id. Cross-examination is the principal way to test the believability and truthfulness of the testimony, and it has traditionally been used to impeach or discredit the witness. Id.
In United States v. Owens, 484 U.S. 554, 108 S.Ct. 838, 98 L.Ed.2d 951 (1988), the Supreme Court addressed the issue of whether a Confrontation Clause violation can be based upon a witness’ loss of memory. In Owens, a correctional counselor sustained severe memory impairment after being beaten with a metal pipe. When he was first interviewed in the hospital by the FBI, he could not recall his attacker. A few weeks later, he was able to describe the attack and identify his attacker. At trial, the counselor testified he remembered identifying his attacker in | inthe second interview in a photographic lineup; however, on cross-examination, he admitted he could not remember seeing his assailant. He further could not remember if anyone in the hospital had suggested the identity of his attacker to him despite defense counsel’s attempt to refresh the counselor’s memory with hospital records, which showed he had attributed the assault to someone other than the defendant.
In finding no Confrontation Clause violation, the Supreme Court explained that “the Confrontation Clause guarantees only ‘an opportunity for effective cross-examination, not examination that is effective in whatever way, and to whatever extent, the defense might wish.’ ” Owens, 484 U.S. at 559, 108 S.Ct. at 842 [emphasis as in original; internal citations omitted]. The Supreme Court stated that there are other realistic means of impugning the witness; however, it admitted that “[t]he weapons available to impugn the witness’ statement when memory loss is asserted will of course not always achieve success,” but emphasized that “successful cross-exami *1168 nation is not the constitutional guarantee.” Id., 484 U.S. at 560, 108 S.Ct. at 843. The Supreme Court specifically held that the Confrontation Clause is not violated by the admission of a statement of a witness, who is unable because of a memory loss, to testify concerning the basis for the statement. Id., 484 U.S. at 564, 108 S.Ct. at 845.
Many years later, in Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the Supreme Court held that the Confrontation Clause requires that testimonial statements can only be admitted as evidence at a criminal trial when the declarant is unavailable to testify and the defendant has had a prior opportunity to cross-examine the declarant. In footnote nine of its opinion, the Supreme Court stated that “when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior Intestimonial statements.” Crawford, 541 U.S. at 59 n. 9, 124 S.Ct. 1354, 1369, 158 L.Ed.2d 177. It further stated, “[t]he Clause does not bar admission of a statement as long as the declarant is present at trial to defend or explain it.” Id.
Based on Owens and Crawford, a declarant’s appearance and subjection to cross-examination at trial are all that is necessary to satisfy the Confrontation Clause, even if the declarant suffers from memory loss.[6] See United States v. Keeter, 130 F.3d 297, 302 (7th Cir.1997), cert. denied, 523 U.S. 1034, 118 S.Ct. 1331, 140 L.Ed.2d 492 (1998)(allowed the admission of an affidavit signed by a witness before trial that implicated the defendant even though the witness feigned amnesia at trial and claimed to have no memory of making the statement or of the events described in the statement); State v. Holliday, 745 N.W.2d 556, 568 (Minn.2008), cert. denied, 555 U.S. 856, 129 S.Ct. 124, 172 L.Ed.2d 95 (2008)(no Confrontation Clause violation when police officer testified as to information given by a witness during an interview where the witness claimed at trial that he could not remember the interview even after being shown a report detailing the interview; witness’ regular use of ecstasy possibly affected his ability to remember); State v. Price, 158 Wash.2d 630, 146 P.3d 1183, 1192 (Wash.2006)(admission of witness’ out-of-court statement did not violate the Confrontation Clause when the witness is questioned about her prior statement but answers that she is unable to remember the statement; court noted the witness was competent to testify and testified under oath, defense counsel called attention *1169 to her | ialack of memory in closing, and the jury was able to view the witness’ demean- or so they could evaluate for themselves whether the witness was being truthful about her lack of memory); State v. Gorman, 854 A.2d 1164, 1178 (Me.2004), cert. denied, 544 U.S. 928, 125 S.Ct. 1668, 161 L.Ed.2d 490 (2005)(admission of the witness’ grand jury testimony did not violate Confrontation Clause when the witness had selective memory during trial; court found right to confrontation was satisfied when the defendant was given the opportunity to cross-examine the witness before the jury); and State v. Pierre, 277 Conn. 42, 890 A.2d 474, 502 (Conn.2006), cert. denied, 547 U.S. 1197, 126 S.Ct. 2878, 165 L.Ed.2d 904 (2006)(admission of out-of-court statement did not violate Confrontation Clause where the witness claimed he was unable to remember the earlier statement or the events surrounding the statement).
Thus, based on Owens, we find the admission of Ms. Williams’ statement did not violate Defendant’s right to confrontation. Ms. Williams appeared at trial, was sworn in and answered questions posed to her. Although she claimed she did not remember giving the statement to the police, she admitted the voice on the recorded statement sounded like her. We find that under these circumstances, Defendant was afforded an adequate opportunity to cross-examine Ms. Williams sufficient to satisfy the requirements of the Confrontation Clause.
Defendant relies on State v. Williams, 04-608 (La.App. 5 Cir. 11/30/04); 889 So.2d 1093, 1100-02, writ denied, 05-81 (La.4/22/05); 899 So.2d 559, to support his argument that his right to confrontation was violated. In Williams, this Court found that the defendant’s right to confrontation had been violated when a witness’ statement was admitted into evidence even though the witness denied giving a statement to the police and claimed he had no knowledge about the questions being asked by the prosecutor.
|1sIn Williams, the witness, who was a co-defendant who had already been convicted, initially refused to testify after asserting his Fifth Amendment right. The trial court found the witness was immune from prosecution and compelled him to testify. Thereafter, the witness answered the prosecutor’s questions but insisted he never gave a statement to the police. Defense counsel cross-examined the witness but only questioned him on his medical conditions and asked no questions about the statement.
We find Williams is factually distinguishable from the present case. In particular, the witness in Williams denied giving a statement to the police whereas the witness in the present case only testified that she could not remember giving a statement and admitted that the voice on the recorded statement sounded like her. Additionally, defense counsel in Williams actually attempted to cross-examine the witness, whereas defense counsel in the present case did not ask one question on cross-examination despite the fact the witness was available for cross-examination; she was on the stand and had answered questions posed by the prosecutor and the co-defendant’s defense counsel. Defense counsel may not have liked the fact that Ms. Williams claimed she could not remember her statement, but she did not deny giving one. As discussed earlier, the Confrontational Clause does not guarantee successful cross-examination, but rather only the opportunity for cross-examination. Owens, 484 U.S. at 560, 108 S.Ct. at 843. Other Crimes Evidence
Defendant asserts the trial court erred in allowing the State to present evidence that he attempted to murder three *1170 unarmed people six days before Ross’ murder. He contends this evidence was inadmissible other crimes evidence, especially in light of the fact he offered to stipulate that he possessed the murder weapon six days earlier on April 5, 2010.
114The State contends the evidence was necessary to refute Defendant’s claim that the gun belonged to Westerman and that Defendant temporarily possessed the gun on April 5, 2010 for self-defense.
Generally, evidence of other crimes or bad acts committed by a criminal defendant is not admissible at trial. La. C.E. art. 404(B)(1); State v. Davis, 08-165 (La.App. 5 Cir. 7/29/08); 993 So.2d 295, 303, writs denied, 08-2188 (La.5/1/09); 6 So.3d 810 and 08-2200 (La.5/1/09), 6 So.3d 811. However, when evidence of other crimes tends to prove a material issue and has independent relevance other than to show that the defendant is of bad character, it may be admitted by certain statutory and jurisprudential exceptions to this rule. State v. Dauzart, 02-1187 (La.App. 5 Cir. 3/25/03); 844 So.2d 159, 165. Evidence of other crimes is not admissible to prove the character of a person in order to show that he acted in conformity therewith; however, it may be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident. La. C.E. art. 404(B)(1); Id.
In order for other crimes evidence to be admitted under Article 404(B)(1), one of the factors enumerated in the article must be at issue, have some independent relevance, or be an element of the crime charged. State v. Jackson, 625 So.2d 146, 149 (La.1993). Further, the probative value of the extraneous evidence must outweigh its prejudicial effect. La. C.E. art. 403.
The defendant bears the burden to show that he was prejudiced by the admission of the other crimes evidence. Davis, 993 So.2d at 303. Absent an abuse of discretion, a trial court’s ruling on the admissibility of evidence pursuant to Article 404(B)(1) will not be disturbed. State v. Williams, 02-645 (La.App. 5 Cir. 11/26/02); 833 So.2d 497, 507, writ denied, 02-3182 (La.4/25/03); 842 So.2d 398.
| ^Prior to trial, the State filed a notice of intent to introduce evidence of other crimes seeking to introduce evidence that Defendant pled guilty to three counts of attempted second degree murder based on an incident that occurred on April 5, 2010, wherein Defendant fired a .45 caliber Glock, the same weapon used to murder the victim in this case. The State argued that said evidence was admissible under La. C.E. art. 404(B) to show identity and opportunity. The trial court ultimately ruled that the evidence was admissible to prove plan, motive, and intent.
Defense counsel subsequently offered to stipulate that Defendant was in possession of and fired the firearm in question six days before Ross’ murder, and that Defendant was with Westerman in Westerman’s truck when it happened. The State offered a counter-stipulation that Defendant was the same person who pled guilty to three counts of attempted murder, which defense counsel initially refused. Ultimately, the parties stipulated to a certified conviction packet that showed Defendant pled guilty to three counts of attempted murder that occurred on April 5, 2010.
At trial, the State presented several witnesses who testified regarding the April 5, 2010 shooting. Westerman testified that on that day, he was at a gas station when he saw three guys standing nearby and staring at him in a menacing way. Wes-terman called Williams to come to the gas station to see if he knew the guys. *1171 Williams was unable to come and Defendant came instead. Westerman met Defendant at a nearby store and Defendant got into Westerman’s truck. According to Westerman, he pulled up next to the three guys and asked “what was the problem.” One of the guys responded there was no problem, at which point Westerman intended to leave. However, shots were suddenly fired. Westerman looked to the side and saw that Defendant was out of the truck and shooting towards the guys, who were running. Defendant then returned to the truck and |1fithey left the scene. Westerman testified that he did not think anyone had been hit, but one of the guys was shot in the leg and testified at trial regarding the incident.
The investigating officer testified that .45 caliber casings were recovered from the scene. He explained that the April 10, 2010 murder also involved a .45 caliber firearm.
We find no error in the admission of evidence relating to the April 5, 2010 shooting. Evidence that Defendant shot someone on April 5, 2010 with the same gun used to kill Ross six days later was relevant to establish that Defendant killed Ross by showing identity, opportunity and plan. The State was not required to accept Defendant’s stipulation in lieu of presenting evidence. The State cannot be robbed of the moral force of its case merely because a stipulation is offered. See State v. Watson, 449 So.2d 1321, 1326 (La.1984), cert denied, 469 U.S. 1181, 105 S.Ct. 939, 83 L.Ed.2d 952 (1985). “[T]he prosecution is entitled to prove its case by evidence of its own choice” and a defendant “may not stipulate or admit his way out of the full evidentiary force of the case as the government chooses to present it.” State v. Ball, 99-428 (La.11/30/99), 756 So.2d 275, 280 (quoting Old Chief v. United States, 519 U.S. 172, 186-87, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997)).
Evidence of the April 5, 2010 shooting was admissible to show that the gun used in that shooting belonged to Defendant, and not to Westerman. Defendant’s proposed stipulation suggested that Defendant only temporarily possessed Wester-man’s weapon in order to defend himself and was carefully worded to avoid an admission that the gun in question belonged to Defendant. However, in one of Wester-man’s statements regarding the April 5, 2010 shooting, which was played for the jury, Westerman said that he knew Defendant owned a .45 caliber gun.
Further, evidence of the April 5, 2010 shooting was admissible to refute | ^Defendant’s contention that he acted in self-defense during that shooting. In his opening statement, defense counsel claimed that Westerman was the aggressor in that shooting, that Defendant got caught in a “shootout,” that he found the gun in Westerman’s truck and fired it, and that he left the gun in Westerman’s truck after the shooting. Defense counsel also claimed in his opening statement that if he had Westerman’s truck, he would show that the other individuals shot at defendant. In his closing argument, defense counsel reiterated that Defendant fired the gun at the three individuals because shots were being fired at him. However, Wes-terman and the victim both testified at trial that Defendant was the only one who shot a gun.
Accordingly, we find no error in the admission of evidence relating to the April 5, 2010 shooting.

ERRORS PATENT

Pursuant to La.C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); and State v. Weiland, 556 So.2d 175 (La.App. *1172 5th Cir.1990), we reviewed the record for errors patent and found no errors.

DECREE

For the foregoing reasons, we find Defendant’s right to confrontation was not violated by the admission of Ms. Williams’ statement to the police. Additionally, we find no error in the trial court’s admission of evidence pertaining to the April 5, 2010 shooting, in which Defendant was involved and which resulted in Defendant’s guilty plea to three counts of attempted murder. Accordingly, Defendant’s conviction and sentence for second degree murder are affirmed.

AFFIRMED

. The indictment also charged co-defendant, Robbreion Green, with second degree murder. Green was convicted and filed a separate appeal, which bears docket number 13-KA-238.

. At trial, Westerman testified that he went to Tim’s Billiards so the surveillance cameras would show Defendant and Green hiding their guns.

. At trial, Westerman’s girlfriend testified that Westerman told her that he saw one of the men shoot the victim first, and then the other man stood over the victim and shot him in the face and head. She explained that she went to the Detective Bureau with Westerman and gave a recorded statement to the same effect to which she testified.

. Westerman's fourth and fifth statements given at 5:16 a.m. and 5:41 a.m. discussed his involvement in the April 5, 2010 nonfatal shooting. In his fourth statement, Wes-terman explained that he went to a gas station and three men were staring at him. Thereafter, he picked up Defendant to see if Defendant recognized the men. Words were exchanged when Westerman and Defendant encountered the men, and Defendant shot one of the men in the leg. In his fifth statement, Westerman said he had positively identified Defendant in a photographic lineup as the person who was in his truck on April 5th and who had shot at three people.

. We note that Ms. Williams was not charged or implicated in this case. The privilege against self-incrimination embodied in the Fifth Amendment to the United States Constitution and Article I, § 16 of the Louisiana Constitution provides that, "[n]o person shall be compelled to give evidence against himself.” A witness may only invoke the Fifth Amendment privilege against self-incrimination only in response to questions where the witness “has reasonable cause to apprehend danger from a direct answer.” State v. Coleman, 406 So.2d 563, 566 (La.1981). Additionally, a witness must generally assert his Fifth Amendment privilege on a question by question basis rather than by claiming a blanket privilege. State v. Lewis, 01-1084 (La.App. 5 Cir. 3/13/02); 815 So.2d 166, 174, writ denied, 02-1053 (La.11/15/02); 829 So.2d 424. Further, a witness "is not exonerated from answering merely because he declares that in doing so he would incriminate him *1167 self — his say-so does not of itself establish the hazard of incrimination.” Coleman, supra, quoting Hoffman v. United States, 341 U.S. 479, 487, 71 S.Ct. 814, 818, 95 L.Ed. 1118, 1124(1951).

. We note the Mississippi Supreme Court found a distinction between feigned and genuine memory loss for purposes of the Confrontation Clause. In Goforth v. State, 70 So.3d 174 (Miss.2011), the witness was in a car accident prior to trial that severely impaired his physical and mental conditions. At trial, he testified that he could not remember giving a statement to the police and did not even remember knowing the victim or the defendant. The witness’ statement was admitted into evidence and read to the jury. The court found the admission of the witness' statement violated the Confrontation Clause, but ultimately determined it was harmless error. The court noted that although Crawford, supra, did not require a showing that the witness actually defended or explained his statement, its comment that "the declarant is present at trial to defend or explain” suggested that the witness had to have "presence and ability to act.” Goforth, 70 So.3d at 186. The court found that because the witness’ memory loss was real as opposed to feigned, he did not have the requisite minimal ability or capacity to act so as to afford the defendant an opportunity for cross-examination. We need not comment on this issue in this case as there is no indication in the record that Ms. Williams' memory loss was genuine. To the contrary, the record shows there were ample reasons to be suspicious about Ms. Williams’ alleged memory loss.