STATE OF LOUISIANA

VERSUS

RONALD GASSER

NO. 18-KA-531

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

ON APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 16-7108, DIVISION "K"
HONORABLE ELLEN SHIRER KOVACH, JUDGE PRESIDING

July 03, 2019

**ROBERT A. CHAISSON**
**JUDGE**

Panel composed of Judges Fredericka Homberg Wicker,
Jude G. Gravois, and Robert A. Chaisson

**CONVICTION AND SENTENCE AFFIRMED**
 **RAC**
 **FHW**
 **JGG**

COUNSEL FOR PLAINTIFF/APPELLEE,
STATE OF LOUISIANA
        Paul D. Connick, Jr.
        Terry M. Boudreaux
        Darren A. Allemand

COUNSEL FOR DEFENDANT/APPELLANT,
RONALD GASSER
        Dane S. Ciolino

**CHAISSON, J.**

Defendant, Ronald Gasser, seeks review of his conviction and sentence for manslaughter. On appeal, he challenges the sufficiency of the evidence used to convict him and contends that his conviction by a non-unanimous jury violated his constitutional rights. In addition, defendant raises issues relating to the trial court's alleged improper admission of other crimes evidence, improper admission of evidence and argument relating to the possibility of retreat, and failure to properly instruct the jury. We have carefully considered defendant's arguments in light of the entire record and the applicable law and find them to be without merit. Accordingly, we affirm defendant's conviction and sentence for manslaughter.

## PROCEDURAL HISTORY

On February 2, 2017, a Jefferson Parish Grand Jury filed an indictment charging defendant with the second degree murder of Joseph McKnight, in violation of La. R.S. 14:30.1. Defendant pled not guilty, and following the resolution of various pre-trial pleadings, the matter proceeded to trial before a twelve-person jury on January 16, 2018. After considering the evidence presented, the jury, on January 26, 2018, found defendant guilty of the lesser included offense of manslaughter, in violation of La. R.S. 14:31. As a result of this conviction, the trial court sentenced defendant to imprisonment at hard labor for thirty years.[1] Defendant now appeals.

## FACTS

In the afternoon hours of December 1, 2016, defendant, the driver of a blue Infiniti, and Mr. McKnight, the driver of a grey Audi SUV, were involved in a road rage incident. The encounter between the two drivers apparently began on the Crescent City Connection, continued onto General DeGaulle Avenue and Behrman Place, and then culminated in the shooting death of Mr. McKnight at the

---

[1] It is noted that defendant filed a motion to reconsider sentence, which was denied.

intersection of Behrman Highway and Holmes Boulevard on the westbank of Jefferson Parish.

No witness observed the entire occurrence; however, the State presented a multitude of witnesses at trial to detail the interaction between the two vehicles on various portions of the route. While on the Crescent City Connection, Patricia Scarborough observed, through her rear view mirror, a grey SUV driving "really fast and aggressively," weaving in and out of traffic, cutting people off, and trying to maneuver its way down the bridge. Ms. Scarborough also noticed a bright blue vehicle at the top of the bridge trying to change lanes, and as it was doing so, almost came into contact with the back part of the grey SUV because the SUV was merging over so fast. As the grey SUV passed the blue vehicle, the two drivers started to engage in "some type of road rage,"[2] with the blue vehicle sometimes behind the grey one and the grey vehicle sometimes behind the blue one.

Jerrod Jones also noticed the two vehicles speeding, weaving in and out of traffic, and attempting to catch up with each other on the Crescent City Connection. Mr. Jones described that this interaction between the two drivers continued onto the General DeGaulle exit ramp[3] and down General DeGaulle Avenue. He detailed that the two vehicles were side by side jockeying for position down General DeGaulle Avenue, that the grey vehicle pulled over to turn right at Behrman Place, and that the blue vehicle came around it, also made the turn, and moved in front of the grey vehicle.

---

[2] Ms. Scarborough described: "At that point both seem to be engaged into what appeared to be road rage with the back-and-forth, the slamming on the brakes, the lane changing, and the - - just pushing back and forth, getting over into each other's lanes."

[3] According to Mr. Jones, the grey vehicle had already started exiting at General DeGaulle when the blue vehicle, which was headed towards the Terry Parkway exit, "shoots across" to exit at General DeGaulle, almost hitting the grey car and a barricade in the process. In contrast, Ms. Scarborough explained that it would have been almost impossible for the blue vehicle to get in the lane for the Terry Parkway exit given the traffic and the fact that the grey vehicle was pushing the blue car towards the rail on the right side of the bridge. In his statements, defendant denied that he chose to follow the grey car onto the General DeGaulle exit; rather, he maintained that he took that exit because he was distracted and unable to get around traffic to exit at Terry Parkway.

The two drivers continued to engage in mutually antagonistic behavior down Behrman Highway with witnesses observing speeding, changing lanes, hand gestures, and cursing. The two vehicles ultimately came to a stop at a red light at the intersection of Behrman Highway and Holmes Boulevard. According to the evidence presented at trial, the two vehicles were situated side by side approximately two feet apart. The blue vehicle, driven by defendant, was in the lane going straight into Jefferson Parish on Behrman Highway. The grey Audi, driven by Mr. McKnight, was located partially in the turn lane that veered to Holmes Boulevard. This position placed the driver's side of Mr. McKnight's vehicle next to the passenger's side of defendant's vehicle.

Veronica Hoye was stopped at the red light next to the driver's side of the blue vehicle and heard loud arguing and fussing. Getting scared, Ms. Hoye looked around to see where the noise was coming from and noticed the blue vehicle and the grey SUV. Ms. Hoye described that both men were in their vehicles, having words back and forth, and she particularly heard the black male in the SUV saying, "Why are you f'ing doing this," and "This is crazy." She further heard him say, "You get out the car. No. You get out the car," and "it doesn't have to be this way."[4] Afterward, the black male got out of his vehicle, went to the open passenger-side window of the blue vehicle, and leaned on it. According to Ms. Hoye, she heard no yelling or arguing at that point, and the situation appeared to have calmed down. Ms. Hoye then heard three gunshots.

Defendant immediately exited his vehicle with his weapon drawn. After he surveyed the scene, defendant put the weapon down and waited for the police to arrive. In the meantime, Wendell Sam, who was near the intersection and heard the three shots, saw the victim on the ground and sprinted towards him to render

---

[4] Ms. Hoye testified at trial that because of her position, she could better hear the words of the individual in the grey SUV. Since the individual in the blue car had his back towards her, she could not clearly hear what he was saying.

aid. Mr. Sam, with the assistance of another individual, moved the victim from between the two vehicles and thereafter started CPR.

Deputy Anthony Patrick of the Jefferson Parish Sheriff's Office was the first officer to respond to the scene. Upon his arrival, he observed a large crowd of people gathering, the two vehicles parked side by side at the intersection, and people crouched on the ground assisting the victim. After ascertaining the parties involved, Deputy Patrick approached defendant and asked what had happened, to which defendant replied, "He cut me off and got out on me." Deputy Patrick advised defendant that he was being detained, handcuffed him, and had him sit on the ground by the rear wheel of his vehicle. At that point, Jefferson Parish Constable John Oleaga arrived on the scene and stayed with defendant while Deputy Patrick secured the weapon and then assisted Mr. Sam with CPR. Despite their efforts, Mr. McKnight died on the scene, at which point Deputy Patrick secured the scene and contacted homicide investigators and crime scene.[5]

In the meantime, Deputy Doris Green of the Jefferson Parish Sheriff's Office arrived on the scene and ascertained from Constable Oleaga that he had read defendant his *Miranda*[6] rights and that Deputy Patrick had secured the weapon. Deputy Green then took defendant into custody and placed him in the back seat of her unit. According to Deputy Green, defendant spontaneously told her that the victim exited his vehicle and placed his hand inside defendant's vehicle, after which he shot the victim. Deputy Green then took defendant to the detective bureau.

---

[5] Sergeant Rodney Naumann of the Jefferson Parish Sheriff's Office Crime Scene Division arrived on the scene, took photographs, and handled the documentation and collection of the evidence. At trial, he went through the photographs and verified that they accurately reflected the scene of the crime. During his testimony, he specifically noted that the victim's driver-side window and defendant's passenger-side window were down and that there was a metal ladder on the front passenger seat in defendant's vehicle. Sergeant Naumann also noted that the ladder had striking damage caused by a projectile, that there was damage to the interior passenger door of defendant's vehicle, and that there was a small sample of blood on the interior door frame and on the weather stripping of the window.

[6] *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

18-KA-531                                            4

After being advised of his rights by Detective William Roniger, defendant gave his first videotaped statement, which was played for the jury at trial. In this initial statement, defendant admitted shooting the victim after they had engaged in mutual road rage. Defendant explained that the incident began as he was driving home from work on the Crescent City Connection when an individual, who was driving aggressively in a grey Audi, zoomed across a few lanes of traffic and cut in front of him. In response, defendant called Mr. McKnight a "stupid m***** f*****," at which point the two men began making hand gestures and screaming at each other. Defendant explained that this behavior continued down General DeGaulle Avenue with Mr. McKnight yelling to defendant to pull over so they could settle this. Defendant also told the detective that Mr. McKnight threw something at his vehicle, possibly a drink, as they were traveling down General DeGaulle. Defendant further explained that he made a quick right turn onto Behrman hoping to end the situation, that Mr. McKnight followed him onto Behrman, and that the two continued to engage with each other. Mr. McKnight kept urging defendant to stop and get out of his car, and defendant kept calling Mr. McKnight a "stupid m***** f*****" and telling him that he was not getting out of his car.

According to defendant, when they arrived at the intersection of Behrman Highway and Holmes Boulevard, Mr. McKnight pulled up very close to him, and the arguing continued through open windows with both parties still inside their vehicles. Defendant relayed in his statement that Mr. McKnight was yelling for him to get out of his car and threatening to "f*** him up." Mr. McKnight then exited his vehicle, went to defendant's open passenger window, leaned into the car, and repeatedly said, "Get out your car m***** f*****. I'm going to kill you. I'm going to f*** you up." In response, defendant told Mr. McKnight many times to "get his f****** hands off his f****** car." Defendant claimed that Mr.

McKnight made an aggressive move and lunged into his vehicle with his upper body and hands. At that point, when Mr. McKnight lunged into defendant's car and threatened to kill him, defendant feared for his life, drew his gun, and fired several shots. Not knowing if he hit Mr. McKnight, defendant immediately exited his car with his gun in a police stance. After surveying the scene and ascertaining that the threat was gone, he put his gun down. In his first statement, defendant maintained that Mr. McKnight's hands and upper body were inside his vehicle, that he could not escape because there were cars on all sides of him, that he feared for his life, and that he assumed Mr. McKnight had a weapon, although he acknowledged that Mr. McKnight never produced or brandished a weapon. After this first statement, defendant was released from police custody.

During the course of their investigation, the officers gained information that caused them to question some assertions made in defendant's first statement. As a result of this new information, Detective Roniger and Lieutenant Donald Meunier took a second statement from defendant on December 2, 2016, and a third statement from defendant on December 5, 2016, both of which were played for the jury at trial. Defendant maintained that Mr. McKnight lunged at him and threatened him, that he was fearful for his life, and that when he fired the gun, Mr. McKnight's hands and head were inside his vehicle. Defendant also relayed that Mr. McKnight was challenging him, and that he did not initiate anything and was responding to Mr. McKnight, although he admitted that neither did anything to disengage along the route. On the same date as his third statement, defendant was arrested for manslaughter.

Several expert witnesses also testified at trial. Specifically relevant to the issues raised in this appeal are the testimonies of Dr. Dana Troxclair, the forensic pathologist who performed the autopsy on the victim, and Chief Timothy Scanlan of the Jefferson Parish Sheriff's Office, who testified as an expert in the fields of

firearm and toolmark identification, crime scene reconstruction, and blood stain pattern analysis.

Dr. Troxclair determined that the victim died of multiple gunshot wounds and particularly noted that the victim sustained a gunshot wound on the right shoulder, the right mid-chest, and the second and third finger of his left hand. She noted that the victim's hand injury was consistent with his hand being on the door, and further that the victim's arm could not have been fully extended at the time of the shooting because the projectile did not hit the deltoid muscle in that arm. In addition, Dr. Troxclair did not see any stippling, soot, or searing on any of the wounds, and because of the lack of stippling, she determined that the victim's wounds were not contact or close range. She explained that stippling is present when a weapon is fired at an intermediate range of two to three feet but is not present if the weapon is fired at a distant range of greater than two to three feet, depending on the weapon and the ammunition used. Although there was no stippling present on the victim's wounds, Dr. Troxclair classified the range as the outer end of the intermediate range or about three feet away, taking into account that the victim was wearing clothing at the time of the shooting.

Chief Scanlan testified that the evidence in this case is consistent with the victim's hand being at or near the edge of the door when it was hit by a projectile. He testified that based on the blood spatter, the victim's hand was kind of "dangling" and was shot as it was between the ladder that was on the front passenger seat and the passenger door. It was his expert opinion that based on the blood spatter and lack of stippling, the victim's body, head, hands, legs, or torso did not go past where the victim's hand was on the outer edge of the door.

## SUFFICIENCY OF THE EVIDENCE
### *(Assignment of Error Number Two)*

On appeal, defendant challenges the sufficiency of the evidence used to convict him.[7] He contends that this Court should reverse his conviction for manslaughter and enter a judgment of acquittal because no reasonable juror could have found that his shooting of the victim was unjustified under Louisiana's "shoot-the-intruder" law as set forth in La. R.S. 14:20(A)(4)(a).

The constitutional standard for testing the sufficiency of the evidence, as enunciated in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See State v. Ortiz*, 96-1609 (La. 10/21/97), 701 So.2d 922, 930, *cert. denied*, 524 U.S. 943, 118 S.Ct. 2352, 141 L.Ed.2d 722 (1998); *State v. Batiste*, 16-321 (La. App. 5 Cir. 12/14/16), 208 So.3d 1028, 1032, *writ denied*, 17-300 (La. 11/17/17), 229 So.3d 929. Both the direct and circumstantial evidence must be sufficient to support the conclusion that the defendant is guilty beyond a reasonable doubt. *State v. Harrell*, 01-841 (La. App. 5 Cir. 2/26/02), 811 So.2d 1015, 1019.

When circumstantial evidence is used to prove the commission of the offense, La. R.S 15:438 provides, "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." The reviewing court is not required to determine whether another possible hypothesis of innocence suggested by the defendant offers an exculpatory explanation of events. Rather, the reviewing court must determine whether the possible alternative hypothesis is sufficiently reasonable

---

[7] When the issues on appeal relate to both the sufficiency of evidence and one or more trial errors, the reviewing court should first determine the sufficiency of the evidence by considering the entirety of the evidence. *State v. Hearold*, 603 So.2d 731, 734 (La. 1992).

that a rational juror could not have found proof of guilt beyond a reasonable doubt. *State v. Mitchell*, 99-3342 (La. 10/17/00), 772 So.2d 78, 83; *State v. Washington*, 03-1135 (La. App. 5 Cir. 1/27/04), 866 So.2d 973, 977.

In the instant case, defendant was charged with second degree murder but convicted of the lesser included offense of manslaughter.[8]  On appeal, he does not challenge the statutory elements of the offense; rather, he admits that he shot and killed Mr. McKnight but maintains that the killing was justified.

The fact that an offender's conduct is justifiable, although otherwise criminal, constitutes a defense to prosecution for any crime based on that conduct "when the offender's conduct is in defense of persons or of property under any of the circumstances described in Articles 19 through 22."  La. R.S. 14:18(7); *State v. Sparkman*, 13-640 (La. App. 5 Cir. 2/12/14), 136 So.3d 98, 106, *writ denied*, 14-477 (La. 11/26/14), 152 So.3d 897.  When a defendant raises justification as a defense to murder, the State must prove beyond a reasonable doubt that the killing was not justified.  *State v. McKinney*, 99-395 (La. App. 5 Cir. 11/10/99), 749 So.2d 716, 720.

La. R.S. 14:20(A) provides four distinct instances for which justifiable homicide may be claimed.  *State v. Cook*, 46,843 (La. App. 2 Cir. 1/25/12), 86 So.3d 672, 682, *writ denied*, 12-640 (La. 6/22/12), 91 So.3d 969.  Subsections (A)(1) and (A)(4)(a) are particularly relevant to the issues raised in this appeal and provide that a homicide is justifiable:

> (1) When committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily

---

[8] La. R.S. 14:31(A) defines manslaughter, in pertinent part, as follows:

> (1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection.  Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed.

harm and that the killing is necessary to save himself from that danger.

* * * * * * *

(4)(a) When committed by a person lawfully inside a dwelling, a place of business, or a motor vehicle as defined in R.S. 32:1(40) when the conflict began, against a person who is attempting to make an unlawful entry into the dwelling, place of business, or motor vehicle, or who has made an unlawful entry into the dwelling, place of business, or motor vehicle, and the person committing the homicide reasonably believes that the use of deadly force is necessary to prevent the entry or to compel the intruder to leave the dwelling, place of business, or motor vehicle.

However, invocation of the justification defense is not unqualified. La. R.S. 14:21 provides as follows:

A person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict.

At trial, the jury was instructed on all four theories of justification as well as the aggressor doctrine. Defendant's appellate counsel acknowledges that a rational juror could have reasonably concluded that defendant was the aggressor for purposes of his self-defense claim pursuant to La. R.S. 14:20(A)(1) and raises no challenges to the jury's determination in that regard on appeal. Rather, on appeal, defendant focuses on La. R.S. 14:20(A)(4)(a) to support his argument that no reasonable juror could have found that the shooting of Mr. McKnight was unjustified, especially in light of the fact that the evidence at trial was uncontested that Mr. McKnight made an unlawful entry into his vehicle. He also asserts that the aggressor doctrine, the State's principal argument that the shooting was unjustified, did not apply to his "shoot-the-intruder" defense and thus could not have disqualified him from using force under the provisions of La. R.S. 14:20(A)(4)(a). We first address defendant's argument relating to the application of the aggressor doctrine.

Defendant asserts, based on the wording of La. R.S. 14:21, that the aggressor doctrine only applies to self-defense claims brought under the provisions of La. R.S. 14:20(A)(1) of the justifiable homicide statute. He maintains that his "shoot-the-intruder" defense is not a self-defense claim within the parameters of the aggressor doctrine, but rather, a defense of property claim not subject to the aggressor doctrine. Defendant points out that neither La. R.S. 14:20 nor La. R.S. 14:21 provides that an aggressor cannot claim justifiable homicide for prevention of an unlawful entry into a dwelling, place of business, or motor vehicle under La. R.S. 14:20(A)(4)(a). We find no merit to defendant's argument that the aggressor doctrine does not apply to the provisions of La. R.S. 14:20(A)(4)(a).

As noted by the State in its appellate brief, defendant cites no legal authority to support his argument that the aggressor doctrine does not apply to the "shoot-the-intruder" defense. The aggressor doctrine was enacted in 1942 and has never been amended. Paragraph (4) of La. R.S. 14:20(A) was added in 1983 and has been amended several times, including an amendment in 1997 to extend the article to motor vehicles.[9] Certainly, had the legislature intended to place La. R.S. 14:20(A)(4)(a) outside the ambit of La. R.S. 14:21, it would have specified such an exception. Further, as the State points out, defendant's assertion that the aggressor doctrine does not apply to La. R.S. 14:20(A)(4)(a) would lead to unintended consequences insofar as a defendant could possibly instigate a conflict from his vehicle, dwelling, or business, and then hide behind the "shoot-the-intruder" justification when the victim attempts to respond to the provocation.

Lastly, we note that although Subsection (A)(1) is the only provision of La. R.S. 14:20 that actually specifies the word "self-defense," all of the provisions envision the protection of one's person and therefore can be considered self-

---

[9] The statutory notes relating to this amendment indicate that motor vehicles were added to this section "to include defense against carjacking as justifiable homicide."

defense claims for purposes of the application of the aggressor doctrine. Clearly, the "shoot-the-intruder" law is not strictly a defense of property claim as defendant suggests; rather, that law is a recognition of an individual's right to feel safe and secure in his own home or an extension thereof. As noted by the State, while Subsection (A)(4)(a) is based on a differing legal theory, it is still just as much a claim of self-defense as a justifiable homicide under any other provision.[10] Accordingly, we find that the aggressor doctrine is applicable to all provisions of La. R.S. 14:20(A), including the "shoot-the-intruder" justification relied on by defendant. In light of this determination, we further find that the jury could have reasonably concluded that defendant was the aggressor in this case and therefore precluded from asserting a self-defense claim under any of the provisions of La. R.S. 14:20(A).

However, assuming that defendant was not the aggressor, we now turn our attention to defendant's argument that the State failed to carry its burden of proving beyond a reasonable doubt that his shooting of Mr. McKnight was unjustified under the "shoot-the-intruder" law. Specifically, defendant argues that the evidence at trial conclusively established that Mr. McKnight made an unlawful entry into his car, that his subsequent use of lethal force in response to the victim's entry was presumed reasonable, and that the State failed to introduce evidence to overcome the legal presumption that defendant had a reasonable belief that the use of deadly force was necessary to prevent the unlawful entry.

In the present case, the critical items of proof under La. R.S. 14:20(A)(4)(a) are whether Mr. McKnight was attempting to or had made an unlawful entry into

---

[10] We note that in *State v. Cook*, 86 So.3d at 682, the Second Circuit apparently viewed La. R.S. 14:20(A)(4)(a) as a self-defense claim, as evidenced by the following statement: "Arguably, as some of the evidence reflects, this subsection [La. R.S. 14:20(A)(4)(a)] could have also been the basis for Cook's claim of self-defense - although not specifically advanced by him at trial." Likewise, in *State v. Revish*, 15-470 (La. App. 1 Cir. 11/9/15), 185 So.3d 8, 13, *writ denied*, 15-2247 (La. 5/20/16), 191 So.3d 1066, the First Circuit suggested that La. R.S. 14:20(A)(4)(a) is a self-defense claim, stating, "…defendant's claim of self-defense at trial was not based upon the standard of La. R.S. 14:20(A)(4)(a) but upon the standard set forth in La. R.S. 14:20(A)(1)."

defendant's car and whether defendant reasonably believed that the use of deadly force was necessary to prevent Mr. McKnight from entering or to compel him to leave. Both elements need to be present in order to support a finding that defendant was indeed justified in killing Mr. McKnight. *See State v. Ingram*, 45,546 (La. App. 2 Cir. 6/22/11), 71 So.3d 437, 442, *writ denied*, 11-1630 (La. 1/11/12), 77 So.3d 947.

With regard to entry, defendant asserts that the evidence at trial conclusively established that Mr. McKnight made an unlawful entry into his car. At trial, Chief Scanlan testified that the evidence in this case is consistent with the victim's hand being at or near the edge of the door when it was hit by a projectile. He testified that based on the blood spatter, the victim's hand was "dangling" and was shot as it was between the ladder that was on the front passenger seat and the passenger door. We do not necessarily believe that Mr. McKnight's action of placing his hands on the open window constitutes an unlawful entry for purposes of La. R.S. 14:20(A)(4)(a).[11] While Mr. McKnight leaned on the open window and argued with defendant, we have no indication that Mr. McKnight attempted to unlock or open defendant's car door in order to enter. Nonetheless, for purposes of this opinion, we will assume that an unlawful entry occurred and turn our attention to the next part of the inquiry - whether defendant reasonably believed that the use of deadly force was necessary to prevent Mr. McKnight from entering or to compel him to leave.

Under La. R.S. 14:20(A)(4)(a), there is no need for the person using deadly force to believe that he is in danger of losing his life; instead, the person need only reasonably believe that the use of deadly force was necessary to prevent the entry

---

[11] We acknowledge in *State v. Bryant*, 12-233 (La. 10/16/12), 101 So.3d 429, 433, the Louisiana Supreme Court held as a matter of law that an "entry" for purposes of the crime of burglary occurs when any part of the intruder's person crosses the plane of the threshold. No cases were found that defined unlawful entry within the meaning of La. R.S. 14:20(A)(4)(a).

or to compel the intruder to leave the premises or motor vehicle. *See State v. Cook*, 86 So.3d at 682. La. R.S. 14:20(B) creates a presumption as to this belief and reads as follows:

> B. For the purposes of this Section, there shall be a presumption that a person lawfully inside a dwelling, place of business, or motor vehicle held a reasonable belief that the use of deadly force was necessary to prevent unlawful entry thereto, or to compel an unlawful intruder to leave the dwelling, place of business, or motor vehicle when the conflict began, if both of the following occur:
>
> (1) The person against whom deadly force was used was in the process of unlawfully and forcibly entering or had unlawfully and forcibly entered the dwelling, place of business, or motor vehicle.
>
> (2) The person who used deadly force knew or had reason to believe that an unlawful and forcible entry was occurring or had occurred.

On appeal, defendant asserts that since the evidence proved that Mr. McKnight made an unlawful entry into his vehicle, the jury was required to conclude that the use of deadly force was reasonable because of the operation of the presumption in La. R.S. 14:20(B).

We first note our belief that defendant is not entitled to rely on this presumption because it only applies when the person against whom deadly force was used was in the process of unlawfully and **forcibly** entering or had unlawfully and **forcibly** entered the premises or motor vehicle. In the present case, even assuming there was an unlawful entry, there is nothing in the record to suggest a forcible entry as Mr. McKnight placed his hands on the open passenger-side window of defendant's vehicle. In our opinion, even Mr. McKnight's alleged lunging into the car, as per defendant's statement, does not constitute a forcible entry. Accordingly, we find that defendant is not entitled to rely on the presumption set forth in La. R.S. 14:20(B).

However, even assuming that defendant is entitled to rely on this presumption, the State can nonetheless offer evidence to rebut this

18-KA-531                                      14

presumption. In *State v. Ingram*, 71 So.3d at 444-45, the Second Circuit

discussed the nature of the presumption as follows:

> Although the legislature has the power to expand the justifiable
> homicide defense to conclusively declare the use of deadly force
> reasonable in every case of unauthorized entry, it has not done so.
> Instead, the legislature clarified and expanded the "reasonable and
> necessary" requirement in La. R.S. 14:20(A) with the use of the
> "presumption" language in La. R.S. 14:20(B). The statute says that
> there "shall" be a presumption of reasonableness but not that the
> presumption is irrebuttable.
>
> With the presumption, the law recognizes that forcible entry situations
> often develop quickly and may present a threat of harm that allows
> little time for a homeowner to carefully weigh his options in
> defending himself. As Justice Holmes famously stated in a related
> context, "Detached reflection cannot be demanded in the presence of
> an uplifted knife." *Brown v. United States,* 256 U.S. 335, 343, 41
> S.Ct. 501, 502, 65 L.Ed. 961 (1921). However, the presumption of
> reasonableness in La. R.S. 14:20(B) is not a license to kill. The
> legislature's decision to use the term "presumption" rather than a
> mandatory inference of reasonableness means that the State is entitled
> to offer proof that a person's use of deadly force was unreasonable
> even in cases where the victim has made unlawful entry into the
> defendant's home. If the State can prove beyond a reasonable doubt
> that the use of force was unreasonable, the defendant may still be
> guilty of homicide.

Thus, to complete our sufficiency review, we must determine whether the

State offered proof that defendant's use of deadly force was unreasonable under

the circumstances presented herein. In making this determination, we are mindful

of the following provisions of La. R.S. 14:20 relating to retreat:

> C. A person who is not engaged in unlawful activity and who is in a
> place where he or she has a right to be shall have no duty to retreat
> before using deadly force as provided for in this Section, and may
> stand his or her ground and meet force with force.
>
> D. No finder of fact shall be permitted to consider the possibility of
> retreat as a factor in determining whether or not the person who used
> deadly force had a reasonable belief that deadly force was reasonable
> and apparently necessary to prevent a violent or forcible felony
> involving life or great bodily harm or to prevent the unlawful entry.

With regard to these provisions, the appellate court, in *State v. Ingram*, 71

So.3d at 445, stated:

> With these provisions, the legislature has curtailed the evidence that may be offered by the State in proving the use of force unreasonable, and specifically has forbidden the consideration of the possibility of retreat vis-a-vis the use of force. This represents a change in the law, which formerly allowed the consideration of the possibility of escape; *see, e.g., State v. Brown,* 414 So.2d 726 (La.1982).

> The unavailability of the retreat defense does not end the inquiry into the reasonableness of the use of force even when the accused is in his own home. Apart from the "unlawful activity" and "has a right to be" qualifiers, Section C recognizes that a person may "meet force with force."

We recognize, in light of La. R.S. 14:20(C) and (D) that a person claiming justifiable homicide has no duty to retreat under certain circumstances and can meet "force with force;" however, the amount of force employed must still be reasonable under the circumstances presented. Thus, the central issue becomes whether defendant's use of deadly force was a proportional response to the force used or threatened by Mr. McKnight. The following cases illustrate instances in which courts have found the amount of force to be unreasonable.

In *State v. Ingram*, *supra*, the defendant was convicted of manslaughter in connection with the shooting death of his ex-wife. The evidence at trial showed that the defendant's ex-wife entered the defendant's home uninvited and was engaged in a brawl on the floor with his current wife. The defendant thereafter shot and killed his unarmed ex-wife with his hunting rifle. On appeal, the appellate court found that the evidence presented at trial was sufficient to prove beyond a reasonable doubt that the use of deadly force under the circumstances was unreasonable, noting that the defendant was angry with his ex-wife, that there were 9-1-1 calls wherein the defendant stated that his ex-wife had no weapons that he knew of, but he would have to "do something" if she came into the house, and that his ex-wife was in a defensive position when she was shot. The appellate court also noted that the defendant responded to his ex-wife's unarmed assault with

grossly disproportionate force and that there were many levels of force less than deadly force that the defendant could have used.

Likewise, in *State v. Pittman*, 428 So.2d 979, 983 (La. App. 1st Cir. 1983), *writ denied*, 433 So.2d 155 (La. 1983), *cert. denied*, 464 U.S. 836, 104 S.Ct. 122, 78 L.Ed.2d 120 (1983), the appellate court found that the force used by the defendant under the circumstances was unreasonable. In that case, the defendant was seated in the driver's seat of his car parked in front of a bar when the victim parked his car behind the defendant's car. The defendant's car was believed to be the one that had been earlier tailgating the victim's car. The victim got out of his car and walked towards the driver's side of the defendant's car. The victim was next seen at the defendant's car door, then backing up and leaning against an adjacent car. The defendant got out of his car, waved a knife at the occupants of the victim's car, and threatened them. The victim staggered to his car and later died. On appeal, the First Circuit rejected defendant's self-defense claim, finding that the force used was unreasonable under the circumstances. The appellate court noted that the witnesses for the State testified to the defendant's aggressive actions towards the victim by tailgating his car on the highway prior to the incident at the bar, that eyewitness testimony revealed that the victim was unarmed as he walked to the defendant's car while the defendant was seen brandishing a knife, and that the only testimony which indicated that the defendant acted in self-defense was his own uncorroborated statement that the victim leaned into his car and grabbed him.

In *State v. Mayes*, 14-683 (La. App. 3 Cir. 12/23/14), 154 So.3d 1257, 1259-60, *writs denied*, 15-178 and 15-220 (La. 11/16/15), 184 So.3d 24, the defendant claimed that he was justified in shooting the victim because the victim lunged or shoved a table towards him. In finding that the State presented sufficient evidence to disprove the defendant's claim of self-defense, the Third Circuit noted that responding to an oncoming table or lunge by shooting the victim was an excessive

response. Likewise, in *State v. Mincey,* 08-1315 (La. App. 3 Cir. 6/3/09), 14 So.3d 613, 615-16, the appellate court rejected the defendant's self-defense argument, finding that responding to an oncoming punch by shooting the other person in the chest was an excessive response and that the level of force he used to defend himself was far beyond what was necessary under the circumstances.

Similar to the conclusions reached in these cases, we find that the amount of force employed by defendant was a disproportionate response to Mr. McKnight's actions. Specifically, the jury heard testimony that the victim was unarmed. While in his statement defendant said he assumed that the victim had a weapon, he admitted that he never saw the victim produce or brandish a weapon. The jury also heard defendant's claim that the victim lunged at him through the open window prior to the shooting; however, no evidence, other than defendant's self-serving statement, supported this claim. In fact, the physical evidence contradicted this assertion and showed that the victim was not lunging towards defendant at the time of the shooting. The victim had no stippling on the exposed areas of his body and no gunpowder on his clothes, which the experts said would have been present if the victim had been shot at such a close range. The jury was also presented with evidence that defendant's front passenger window was down, that there was a ladder on defendant's front passenger seat between the victim and defendant, and that the victim never put his hands on defendant.

Given this evidence, we conclude that a rational trier of fact could have found that the State proved beyond a reasonable doubt that defendant's use of deadly force was unreasonable under the circumstances and that his shooting of Mr. McKnight was unjustified. Accordingly, we find the arguments raised by defendant relating to the sufficiency of the evidence to be without merit.

## ADMISSION OF OTHER CRIMES EVIDENCE
### *(Assignment of Error Number One)*

On appeal, defendant challenges the trial court's admission of other crimes evidence at trial pursuant to La. C.E. art. 404(B). He specifically contends that the trial court erred in allowing the State to introduce evidence that defendant was involved in a 2006 road rage episode, which resulted in his arrest for simple battery. Defendant argues that the ten-year-old incident was not relevant to prove intent, system, or plan as asserted by the State; rather, it only proved that defendant was a hothead and had a propensity for violence. Further, defendant asserts that the erroneous admission of the 2006 incident was highly prejudicial, tainted the jury's fact finding, and was not harmless, especially considering that the verdict was ten to two.

Prior to trial, the State filed a notice of intent to use other crimes evidence pursuant to La. C.E. art. 404(B). Specifically, the State wanted to introduce evidence at trial that defendant was previously involved in a road rage incident on February 20, 2006, at the same location as the shooting in the instant case. In the prior incident, defendant allegedly followed the victim into the parking lot of a gas station at Behrman Highway and Holmes Boulevard, approached the victim, confronted him in an aggressive manner, punched the victim several times, and later claimed he acted in self-defense. In its notice, the State asserted that this prior incident was independently relevant to show motive, intent, system, absence of mistake or accident, and to refute defendant's self-defense claim.

In its opposition to the State's notice, defendant asserted that the prior incident should not be admitted because it did not have a close temporal relationship nor factual similarity to the crime alleged in the instant indictment. Defendant specifically pointed out that the prior incident was a ten-year-old non-adjudicated misdemeanor offense that occurred at a gas station and involved no

injuries or weapons. Further, defendant maintained that the prior episode had no relevance to his intent or self-defense claim, was more prejudicial than probative, and was merely being used by the State to show defendant's bad character or propensity to commit a crime, which purpose is clearly prohibited by law.

On May 25, 2017, the trial court conducted a hearing on the State's request to admit this other crimes evidence. After considering the evidence submitted by the State and the arguments of counsel, the trial court granted the State's notice, finding that the evidence was admissible under La. C.E. art. 404(B). Defense counsel subsequently filed a writ application with this Court challenging the trial court's ruling. On August 9, 2017, this Court denied defendant's writ application.[12] *See State v. Gasser*, 17-K-326 (La. App. 5 Cir. 8/9/17) (unpublished writ disposition). When the matter thereafter proceeded to trial, evidence of this 2006 road rage incident was presented through the testimonies of John Shilling, the victim, and Detective Melvin Francis, the investigating officer.

Specifically, Mr. Shilling testified that on February 20, 2006, he was driving his truck on Behrman Highway near the Walmart when he noticed a man in a small red pickup truck weaving in and out of traffic and following him and other vehicles too closely. Mr. Shilling saw a work sign and phone number on the side of the truck and decided to call to report the erratic driving. When Mr. Shilling told the man who answered the phone about the driver's actions, the person replied, "That was me, you M-Fer, and none of your F'ing business." Mr. Shilling then realized that he was speaking to the man right next to him in the red truck, hung up the phone, and pulled into the gas station near the corner of Holmes Boulevard and Behrman Highway. As he exited his vehicle to get gas, he saw the driver of the

---

[12] Application of the "law of the case" doctrine is discretionary, and the prior denial of a supervisory writ application does not bar reconsideration of an issue on appeal, nor does it prevent the appellate panel from reaching a different conclusion on the issue. *State v. Voltolina*, 10-1090 (La. App. 5 Cir. 10/25/11), 77 So.3d 1027, 1031.

truck, later identified as defendant, running towards him. According to Mr. Shilling, defendant hit him twice in the head and once on the shoulder with his closed fist. Mr. Shilling told defendant he was going to call the police, at which point defendant said, "I'm going to get you." Defendant then got into his truck and sped off.

Detective Francis of the Jefferson Parish Sheriff's Office subsequently spoke to defendant about the incident. At trial, Detective Francis testified that defendant came in voluntarily and gave a statement, in which he claimed that the other driver weaved in and out of traffic, followed him, screamed profanity at him, and spat on his car. Defendant also told the detective that the two men then engaged in a verbal altercation, and after thinking the other driver was going to attack him or damage his car, defendant exited his vehicle to confront the man. Defendant admitted that he struck the other man three times with his fist; however, he claimed it was in self-defense because the other man got out of his vehicle first and was acting "like a nut." Afterward, Detective Francis issued a misdemeanor summons for simple battery to defendant.

Defendant now argues on appeal that the trial court erred in allowing this other crimes evidence. He specifically asserts that this ten-year-old incident proved nothing relevant under the provisions of La. C.E. art. 404(B), that it was used solely to prove that defendant was a hothead and had a propensity for violence, and that its erroneous admission tainted the jury's fact finding and was not harmless.

In *State v. Garcia*, 09-1578 (La. 11/16/12), 108 So.3d 1, 38, *cert. denied*, 570 U.S. 926, 133 S.Ct. 2863, 186 L.Ed.2d 926 (2013), the Louisiana Supreme Court set forth the basic rule governing the admission of other crimes evidence as follows:

The fundamental rule in Louisiana governing the use of evidence of other crimes, wrongs, or acts is, and has been, such evidence is not admissible to prove the accused committed the charged crime because he has committed other such crimes in the past or to show the probability he committed the crime in question because he is a man of criminal character. *State v. Lee,* 05-2098, p. 44 (La.1/16/08), 976 So.2d 109, 139; *State v. Patza,* 3 La. Ann. 512 (1848).

Nevertheless, although evidence of other crimes, wrongs, or acts may not be admitted to prove the accused is a person of criminal character, evidence of other crimes has long been admissible if the state establishes an independent and relevant reason for its admission. *See State v. Anderson,* 45 La. Ann. 651, 654, 12 So. 737, 738 (1893). This very principle is embodied in our Code of Evidence at Article 404(B)(1), which provides, in pertinent part:

> Except as provided in Article 412 [regarding a victim's past sexual behavior in sexual assault cases], evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.

La.Code Evid. art. 404(B)(1). While still prohibiting the state from introducing evidence of other crimes, wrongs, or acts to show a probability the accused committed the charged crime because he is a "bad" person, the rule articulated in Article 404(B)(1) allows admission for other purposes, *i.e.,* to show motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding. La.Code Evid. art. 404(B)(1); *Lee,* 05–2098 at p. 44, 976 So.2d at 139; *State v. Kennedy,* 00–1554, p. 5 (La.4/3/01), 803 So.2d 916, 920.

Even when other crimes evidence is offered for a purpose allowed under La.

C.E. art. 404(B)(1), the evidence must have substantial relevance independent from

showing a defendant's general criminal character and thus is not admissible unless

it tends to prove a material fact at issue or to rebut a defendant's defense. *State v.*

*Taylor*, 16-1124 (La. 12/1/16), 217 So.3d 283, 292. Moreover, the probative value

of the extraneous crimes evidence must outweigh its prejudicial effect.  La. C.E.

art. 403; *State v. Devillier*, 17-572 (La. App. 5 Cir. 10/17/18), 258 So.3d 230, 267.

The defendant bears the burden to show he was prejudiced by the admission

of other crimes evidence.  Absent an abuse of discretion, a trial court's ruling on

the admissibility of evidence pursuant to La. C.E. art. 404(B)(1) will not be

disturbed.  *State v. Garcie*, 17-609 (La. App. 5 Cir. 4/11/18), 242 So.3d 1279,

1285.

In the present case, defendant contends that the State did not introduce the

prior incident to prove any real and genuine fact in dispute, pointing out that

defendant admitted that he killed Mr. McKnight, that it was no accident, and that

he had the specific intent to kill.  Rather, he insists that the State introduced this

highly prejudicial evidence to prove that defendant was a "hothead" in 2006, and

therefore, he must have been a "hothead" in 2016.  Since this is clearly an

impermissible purpose for the introduction of other crimes evidence and since the

incident proved nothing relevant under La. C.E. art. 404(B)(1), defendant

maintains that the trial court should have excluded it.

In its notice of intent to introduce evidence pursuant to La. C.E. art.

404(B)(1), the State asserted that this prior incident was independently relevant to

show motive, intent, system, absence of mistake or accident, and to refute

defendant's self-defense claim.  At the hearing on the admissibility of the other

crimes evidence, the State elaborated on its reasons for the introduction of the prior

incident as follows:

> They're going to have a self-defense claim.  They're going to claim
> that the victim was the aggressor.  That's what this case is going to be
> about.  That's where their defense lies.

> And this prior incident, prior road rage incident by the Defendant is
> highly probative to rebut that defense.  And that's exactly why the --
> why the State intends to use it.

Courts have allowed the admission of other crimes evidence to rebut a defendant's self-defense claim.[13]  In fact, in *State v. Plaisance*, 32,489 (La. App. 2 Cir. 10/27/99), 745 So.2d 784, 788, *writ denied*, 99-3609 (La. 6/2/00), 763 So.2d 594, the appellate court addressed an issue similar to the one presented herein and found no abuse of discretion in the trial court's admission of other crimes evidence.

In the *Plaisance* case, the defendant was charged with second degree murder stemming from a road rage incident.  The defendant did not deny that he shot and killed the victim but rather maintained that he acted in self-defense.  The State sought to introduce at trial evidence of the defendant's involvement in prior road rage incidents in order to disprove the defendant's claim that the victim was the aggressor, and to show intent, motive, knowledge, and lack of accident or mistake.  The trial court allowed the admission of the defendant's prior reckless driving incidents.  In challenging this ruling on appeal, the defendant asserted that the evidence was not relevant to prove opportunity, preparation, plan, knowledge, or identity, and further that the evidence did not demonstrate absence of mistake or accident because the defendant never claimed the shooting was a mistake or accident.  The Second Circuit found no abuse of discretion in the trial court's admission of the other crimes evidence as the evidence helped to establish intent and lack of accident or mistake.  In so ruling, the appellate court stated, "The defendant's assertion that there was no need for the state to demonstrate absence of mistake or accident is incorrect.  The state always bears the burden of proving the defendant had a specific intent to kill."  *Id*. at 788-89.

*See also State v. Scales*, 93-2003 (La. 5/22/95), 655 So.2d 1326, 1331, *cert. denied*, 516 U.S. 1050, 116 S.Ct. 716, 133 L.Ed.2d 670 (1996); *State v. Monroe*,

---

[13] In *State v. Taylor*, 217 So.3d at 288, the Louisiana Supreme Court referred to La. C.E. art. 404(B) as "a non-exhaustive list of instances wherein such evidence may be admissible."

364 So.2d 570, 573 (La. 1978); *State v. Davis*, 13-237 (La. App. 5 Cir. 10/30/13), 128 So.3d 1162, 1171, *writ denied*, 13-2751 (La. 5/23/14), 140 So.3d 723; and *State v. Mayes*, 154 So.3d at 1260-61, in which courts have allowed the admission of other crimes evidence to rebut a defendant's claim of self-defense.

In his appellate brief, defendant relies heavily on *State v. Mills*, 04-489 (La. App. 5 Cir. 3/29/05), 900 So.2d 953, *writ denied*, 05-1470 (La. 1/13/06), 920 So.2d 235, to support his argument that the trial court improperly allowed the admission of other crimes evidence in this case. We have reviewed that case and find it distinguishable from the situation presented herein. In the *Mills* case, this Court found that the trial court erred in admitting evidence, at the defendant's murder trial, of his altercation with deputies two and one-half years after the murder. This Court noted that the other crimes evidence did not have any independent relevance to the murder charge and further was not relevant for the purpose of showing intent, knowledge, or lack of mistake or accident as found by the trial judge.[14] In distinguishing the *Mills* case from the instant case, we note that in *Mills*, the facts and legal theories between the other crimes evidence and the murder were different, whereas in the instant case, the basic facts were similar and the same claim of self-defense was made in both road rage incidents.

Having reviewed the applicable law and jurisprudence, we find no abuse of discretion in the trial court's admission of the 2006 road rage incident. The two incidents were similar insofar as defendant, in each case, actively participated in the perpetuation of the incidents by engaging with the other driver in a verbal altercation. Further, in each incident, defendant claimed that the other motorist was the aggressor and that he acted in self-defense when he hit Mr. Shilling and shot Mr. McKnight. Thus, even accepting defendant's assertion that the 2006 incident failed to prove intent, system, or plan, the evidence was nonetheless

---

[14] In *Mills*, the erroneous admission of the other crimes evidence was ultimately found to be harmless.

relevant to rebut defendant's claim that Mr. McKnight was the aggressor and that he acted in self-defense when he shot him.[15]

We recognize the inherent prejudicial effect of other crimes evidence. However, the underlying policy is not to prevent prejudice, since evidence of other crimes is always prejudicial, but to protect against unfair prejudice when the evidence is only marginally relevant to the determination of guilt of the charged crime. *State v. Williams*, 02-645 (La. App. 5 Cir. 11/26/02), 833 So.2d 497, 507, *writ denied*, 02-3182 (La. 4/25/03), 842 So.3d 398. Although the 2006 incident occurred some ten years before the charged offense,[16] we nonetheless find that its probative value in rebutting defendant's claim that Mr. McKnight was the aggressor and that he acted in self-defense clearly outweighs any resulting prejudice, especially considering the fact that the nature of the prior offense was much less severe than the conduct in the instant case.

Based on the foregoing, we find that the trial court did not abuse its discretion in allowing the admission of defendant's prior road rage incident into evidence at trial.[17]

## JURY INSTRUCTIONS
### *(Assignment of Error Number Three)*

In his next assigned error, defendant argues that the trial court erred in failing to instruct the jury that the aggressor doctrine did not preclude defendant's "shoot-the-intruder" defense. More particularly, he asserts that the trial court

---

[15] Defendant's claim of self-defense clearly implicates his motivation and intent for committing the crime; therefore, the prior incident is also properly admitted for those reasons, which are specifically articulated in the list set forth in La. C.E. art. 404(B)(1).

[16] Remoteness in time is only one factor to be considered when determining whether the probative value of the evidence outweighs its prejudicial effect. Generally, a lapse in time will go to the weight of the evidence, rather than to its admissibility. *State v. Altenberger*, 13-2518 (La. 4/11/14), 139 So.3d 510, 516.

[17] In any event, we note that the erroneous admission of other crimes evidence is subject to a harmless error analysis. An error is harmless when the guilty verdict is surely unattributable to the error. *State v. Devillier*, 258 So.3d at 268. In light of the evidence presented by the State at trial in this case, we find any alleged error in the admission of the other crimes evidence to be harmless. We further note that the trial court gave the jury a limiting instruction on the other crimes evidence.

failed to instruct the jury that the voluminous evidence bearing on the aggressor issue was only relevant to the issue of self-defense under La. R.S. 14:20(A)(1) and that it was not relevant to the issue of defense of property under the "shoot-the-intruder" law as set forth in La. R.S. 14:20(A)(4)(a). Defendant maintains that the trial court's failure in this regard caused the jury to be confused about the applicability of the aggressor doctrine.

La. C.Cr.P. art. 802 mandates that the trial court instruct the jury on the law applicable to each case. *State v. Cornejo-Garcia*, 11-619 (La. App. 5 Cir. 1/24/12), 90 So.3d 458, 462. The standard for reviewing jury charges requires that the charges be read as a whole. *State v. Hill*, 98-1087 (La. App. 5 Cir. 8/31/99), 742 So.2d 690, 698, *writ denied*, 99-2848 (La. 3/24/00), 758 So.2d 147.

La. C.Cr.P. art. 801(C) specifically provides: "A party may not assign as error the giving or failure to give a jury charge or any portion thereof unless an objection thereto is made before the jury retires or within such time as the court may reasonably cure the alleged error."[18] This Court has held that a defendant is required to make a timely objection under La. C.Cr.P. art. 801 in order to preserve a jury charge issue for review. *See State v. Gardner*, 05-62 (La. App. 5 Cir. 6/28/05), 907 So.2d 793, 801.

In the present case, as acknowledged by defendant in his appellate brief, defense counsel did not object to the trial court's failure to give a jury instruction on this issue; therefore, this issue was not properly preserved for appellate review. Nonetheless, based on our determination herein with regard to the application of the aggressor doctrine, we feel compelled to note that the trial court did not err in failing to instruct the jury that the aggressor doctrine did not apply to the "shoot-the-intruder" defense. As noted previously in this opinion, there is no authority to

---

[18] See also La. C.Cr.P. art. 841(A) which provides, in part, that "[a]n irregularity or error cannot be availed of after verdict unless it was objected to at the time of the occurrence."

suggest that the aggressor doctrine does not apply to the provisions of La. R.S. 14:20(A)(4)(a). Further, a review of the jury charges shows that the jury was thoroughly instructed on the law applicable to the case, including the law on the aggressor doctrine and justifiable homicide. Accordingly, this argument has no merit.

## ADMISSION OF EVIDENCE AND ARGUMENT OF RETREAT
### *(Assignment of Error Number Four)*

In his fourth assigned error, defendant contends that the trial court erred in allowing the State to introduce evidence at trial and during closing argument that defendant could have possibly retreated in order to avoid shooting the victim. He contends that any evidence of the possibility of retreat was irrelevant and specifically excluded by Louisiana's "stand-your-ground" law codified in La. R.S. 14:20(C) and (D).

At trial, defendant's videotaped statements were played for the jury. In those statements, the detectives asked defendant why he did not take the Terry Parkway exit instead of following the victim off the General De Gaulle exit, why he did not go straight or make a U-turn on General De Gaulle rather than turning onto Behrman as the victim did, why he did not pull into the parking lots of businesses along the route, why he did not call 9-1-1 at any point, why he did not show defendant he had a gun before using it, and why he did nothing to disengage from the conflict.

Defense counsel objected and requested a jury instruction to ignore any questions or statements that indicated defendant had a duty to retreat. The trial court overruled defense counsel's objection and denied his request for an immediate instruction to the jury. The trial court noted that it would instruct the jurors at the conclusion of trial and also noted that the fact the detectives asked

defendant those questions did not necessarily mean that defendant had a duty to retreat.

During closing argument, the State argued that defendant could not have been very scared during the altercation along the route because defendant kept his window down, did not call 9-1-1, continued to engage with the victim, and did not pull into the numerous businesses along the way. Defense counsel objected, arguing that defendant had no duty to retreat. The trial court agreed but stated that those observations went to the "response of his actions" and that it was going to instruct the jury that defendant had no duty to retreat. Afterward, the State argued in pertinent part:

> And ladies and gentlemen, know this. Not calling 911, not pulling over, okay, that has to do with your options. That's not retreat. We're not arguing retreat. Be real clear. I want to say it now because I don't want to forget it and get - - and have a hearing for it, okay. At that intersection, I'm not arguing that he should have pulled off or should have gotten out and ran away. I'm not arguing that. So don't - - So don't say that. But when I say he didn't call 911, he could have pulled in places, that's not retreat; that should be reasonable and doing what's necessary to get out of a situation.

After closing arguments, the trial court correctly instructed the jurors that defendant did not have a duty to retreat. Defendant now contends that the trial court erred in allowing evidence and argument concerning the possibility of retreat. We find no merit to this argument.

With regard to the issue of retreat, La. R.S. 14:20 provides, in pertinent part, as follows:

> C. A person who is not engaged in unlawful activity and who is in a place where he or she has a right to be shall have no duty to retreat before using deadly force as provided for in this Section, and may stand his or her ground and meet force with force.

> D. No finder of fact shall be permitted to consider the possibility of retreat as a factor in determining whether or not the person who used deadly force had a reasonable belief that deadly force was reasonable and apparently necessary to prevent a violent or forcible felony involving life or great bodily harm or to prevent the unlawful entry.

In discussing these provision, the Louisiana Supreme Court in *State v. Wilkins*, 13-2539 (La. 1/15/14), 131 So.3d 839, stated as follows:

> [T]he effect of the 2006 La. Acts 141, amending La.R.S. 14:20 and adding subsections C and D to the statute, was two-fold: a person may choose to defend himself or herself with deadly force under the circumstances defined in R.S. 14:20(A), without considering whether retreat or escape is possible, *i.e.,* a person "may stand his or her ground and meet force with force" (C); and he or she may do so without fear that, if it came to it, a jury may nevertheless second guess the decision not to flee from the encounter in assessing whether the use of deadly force was justified (D). The overall effect of the 2006 amendments was thus to supplant a jurisprudential rule so deeply entrenched in Louisiana law that some decisions continue to adhere to it to this day.
>
>     *   *   *   *   *   *   *
>
> To the extent that subsection D effectuates the right conferred by Subsection C on an individual to "stand his or her ground" without weighing the possibility of escape or retreat before responding with deadly force, an unqualified right that did not exist previously in Louisiana, the two subsections work in tandem, not separately, to make a substantive change in the law because they directly impact not only how trials are conducted, and how juries may be instructed, but also how individuals may conduct themselves when confronted with situations that they perceive, reasonably or not, to present an imminent threat to their own lives. [Citations omitted]

In contrast to La. R.S. 14:20(C), which imposes no duty to retreat on a person who is not engaged in unlawful activity and is in a place where he or she has a right to be, La. R.S. 14:21 imposes an affirmative duty to withdraw on a person who is the aggressor or who brings on the difficulty in order for that person to be able to claim the right of self-defense.

In the present case, the State maintained that defendant was the aggressor and could not claim self-defense because he never withdrew from the conflict. Therefore, the evidence and argument relating to defendant's possibility of retreat were clearly relevant and admissible for the purpose of determining whether defendant was the aggressor and therefore precluded from claiming self-defense.

Further, we note a distinction between "retreat" at the time of the shooting at the intersection and options that defendant could have taken to disengage along the route. We find *State ex rel. D.P.B.*, 02-1742 (La. 5/20/03), 846 So.2d 753,

instructive on this distinction.[19]  In that case, the juvenile and his friend got into a verbal and physical altercation.  The juvenile then went home.  Later on, the friend, intoxicated and unarmed, entered the juvenile's residence, and the juvenile shot and killed him.  The juvenile was subsequently adjudicated a delinquent for manslaughter.  Although the appellate court found that the evidence was insufficient to support the juvenile's adjudication pursuant to La. R.S. 14:20(A)(4), the Louisiana Supreme Court reversed that decision and reinstated the juvenile's manslaughter adjudication.  In finding that the State established beyond a reasonable doubt that the juvenile could not have reasonably believed that deadly force was necessary to compel the victim to leave his home, the Louisiana Supreme Court observed, in part, that the State offered several options that the juvenile could have taken, "none of which would be considered retreat," but which would have been more reasonable than the juvenile using deadly force against his friend.  Specifically, the court noted that the juvenile could have called 9-1-1, locked the carport door, awakened his father, or "beat his a--" again.  *Id*. at 756.

Likewise, in this case, we find that the complained of evidence is more properly described as reasonable options that defendant could have utilized to end the altercation before they arrived at the intersection and therefore properly admissible even without consideration of the aggressor doctrine.

Further, in its closing argument, the State emphasized that it was not arguing that defendant had the duty to retreat when he was at the intersection.  Lastly, the trial court instructed the jury that defendant did not have the duty to retreat.

In light of these considerations, we find that the trial court did not abuse its discretion by allowing argument or by admitting evidence of reasonable options

---

[19] We acknowledge that Subsections C and D were not contained in La. R.S. 14:20 at the time of this case; however, at the time of the offense in *D.P.B.*, Section (A)(4) had its own internal provision relating to retreat, which provided: "The homicide shall be justifiable even though the person committing the homicide does not retreat from the encounter."

that defendant could have taken to disengage from the conflict. This assigned error is likewise without merit.

## NON-UNANIMOUS JURY VERDICT
### (*Assignment of Error Number Five*)

In his final assigned error, defendant contends that his conviction by a non-unanimous jury violated his rights under the Sixth and Fourteenth Amendments. Defendant recognizes that his argument is not supported by law and acknowledges that the United States Supreme Court has held that the United States Constitution does not require jury unanimity in state court criminal prosecutions, citing *Apodaca v. Oregon,* 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972). However, he nonetheless submits this argument in the event that the United States Supreme Court overrules this now-binding precedent.

In the present case, the date of the offense was December 1, 2016. Also, the jury returned a non-unanimous verdict of ten to two.

The language of La. Act 2018, No. 722, § 1, effective December 12, 2018, and La. Act 2018, No. 493, § 1, effective January 1, 2019, amending La. Const. art. 1, § 17(A) and La. C.Cr.P. art. 782(A), respectively, is clear that the amendment requiring unanimous jury verdicts for crimes whose punishment is necessarily confinement at hard labor applies only in those cases where the offenses are committed on or after January 1, 2019. Before the amendment, and at the time of the instant offense, the constitutionality of non-unanimous jury verdicts was upheld in both *State v. Bertrand*, 08-2215 (La. 3/17/09), 6 So.3d 738, and *Apodaca v. Oregon*, *supra.* Accordingly, as recognized by defendant's appellate counsel, this Court is bound by that precedent. *State v. Thomas*, 10-220 (La. App. 5 Cir. 11/9/10), 54 So.3d 678, 686, *writs denied*, 10-2758 (La. 4/25/11), 62 So.3d 89 and 10-2752 (La. 5/20/11), 63 So.3d 974.

## ERRORS PATENT REVIEW

We have also reviewed the record for errors patent and have found no errors that warrant corrective action.  La. C.Cr.P. art. 920; *State v. Oliveaux*, 312 So.2d 337 (La. 1975); and *State v. Weiland*, 556 So.2d 175 (La. App. 5th Cir. 1990).

Accordingly, we affirm defendant's conviction and sentence for manslaughter.

## CONVICTION AND SENTENCE AFFIRMED

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
ROBERT A. CHAISSON
STEPHEN J. WINDHORST
HANS J. LILJEBERG
JOHN J. MOLAISON, JR.

JUDGES

MARY E. LEGNON
INTERIM CLERK OF COURT

CHIEF DEPUTY CLERK

SUSAN BUCHHOLZ
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX



FIFTH CIRCUIT

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY **JULY 3, 2019** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

_____
MARY E. LEGNON
INTERIM CLERK OF COURT

# 18-KA-531

**E-NOTIFIED**
24TH JUDICIAL DISTRICT COURT (CLERK)
HONORABLE ELLEN SHIRER KOVACH (DISTRICT JUDGE)
TERRY M. BOUDREAUX (APPELLEE)     DANE S. CIOLINO (APPELLANT)     DARREN A. ALLEMAND (APPELLEE)

**MAILED**
HON. PAUL D. CONNICK, JR. (APPELLEE)
DISTRICT ATTORNEY
TWENTY-FOURTH JUDICIAL DISTRICT
200 DERBIGNY STREET
GRETNA, LA 70053